**Jotham Clement JOHNSON, Plaintiff–Appellant,**

v.

**CITY OF SALINE, et al., Defendants–Appellees.**

**No. 97–1041.**

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1998.

Decided Aug. 6, 1998.

---

Mark V. Heusel (briefed), Marian L. Faupel (argued and briefed), John K. Kline (briefed), Faupel & Associates, Ann Arbor, Michigan, for Plaintiff–Appellant.

Michael J. Bommarito, Martens, Ice, Geary, Klass, Legghio, Israel & Gorchow, Southfield, Michigan, Stephen J. Rhodes, Kevin T. McGraw (argued and briefed), R. Lance Boldrey (briefed), Foster, Swift, Collins & Smith, Lansing, Michigan, for Defendants–Appellees.

Before: BOGGS, NORRIS, and MOORE, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. MOORE, J. (p. ——), delivered a separate opinion concurring in part.

## OPINION

BOGGS, Circuit Judge.

Jotham "Jot" Johnson appeals from the dismissal by the district court of his claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* The district court's application of Title II of the ADA was improperly narrow, and so we vacate in part and remand for further proceedings.

### I

### A

Johnson has ankylosing spondylitis, for which he has received social security disability benefits since 1984. The disease caused him to get both of his hips replaced, and his doctor has told him not to carry heavy objects or to use stairs.

In 1988, Johnson entered into an agreement with the city of Saline, Michigan. Under the agreement, which was between the city and SVI (a corporation to be formed by Johnson and an associate), SVI was to operate the city's public access cable station. The agreement was supposed to last for a year, but it provided for renewals. It is disputed whether the agreement was explicitly renewed, but both parties continued performing. At some point, SVI lost its corporate status when it failed to file an annual report.

### B

The contractual relationship between Johnson and the city was complicated. Although not formally required to do so by the contract, the city allowed Johnson to keep any income he obtained from selling advertising on the station. The cable provider paid a franchise fee to the city, which apparently did not pass any of the money along to the

station. Johnson paid the phone and insurance bills, but the city did not charge rent, and it paid the station's other expenses. Johnson also paid for over $10,000 in equipment, adding to the equipment provided by the city.

Johnson listed himself as self-employed on his income tax return; he paid himself a small salary from the money, if any, SVI earned over the course of the year. The city did not provide him with any employee benefits. Johnson described his job responsibilities as "everything," from taking out the trash to "hiring and firing" volunteers. He did not need or obtain any authorization from the city for his personnel decisions, though at one point the city successfully pressured him to fire an associate. In general, though, the record indicates that he was his own boss.

The main problem for Johnson was that the station's studio was on the second floor of a city building. In addition, the only available bathroom was on the first floor. Johnson claims that he notified city officials of his condition and his needs to the best of his ability, and that he pleaded with the city to move the studio to a more easily accessible location. However, it appears that although it was apparent to those who saw Johnson that something was wrong with him, it was unclear to anyone just what his limitations were. After all, Johnson walked up and down the stairs several times a day, making it implausible to expect the city to know that he was not supposed to do so. In a broadcast on the station in February 1995, however, Johnson declared what his restrictions were, and complained about the city's actions regarding the station. There is ample evidence that city officials knew that the second floor of the building was generally inaccessible to disabled people.

## C

A substantial portion of the programming that Johnson produced was for the city and its government. The city paid Johnson on two occasions when he submitted invoices, in 1990 for making a video for the city ($7,000), and in 1992 for undefined "services rendered" ($7,980). In 1994, however, the city refused to pay one of Johnson's invoices.

Johnson was denied payment again in 1995, and the city notified him that it was terminating its agreement with him. Johnson continued trying unsuccessfully to get the city to move the studio, and to negotiate with the city, which purported to want to increase the amount of programming on the station. When Johnson decided to acquiesce in the termination of the agreement, he announced that he would remove from the station all of the equipment he had bought. At this, the city asked to buy the equipment, and asked Johnson to continue running the station until June. The city also formed a commission and a task force to try to resolve its differences with Johnson. The negotiations failed, however, and in June Johnson removed his equipment and ceased operations. The city found another operator, who is not disabled but is less trained and less successful at running the station than Johnson was.

Johnson filed a complaint, with claims under Titles I and II of the ADA. He also asked for damages arising from the alleged worsening of his condition, and physical and mental suffering. The district court dismissed the case on summary judgment. Johnson then filed this timely appeal.

## II

The district court dismissed Johnson's Title I claims because he was not in an employer-employee relationship with the city. Title I of the ADA dictates that

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The statute defines "covered entity" as an employer, "employer" as a person engaged in an industry affecting commerce and employing more than fifteen people, and "employee" as someone employed by an employer. 42 U.S.C. § 12111(2), (4)–(5). The definition of a "qualified individual with a disability" clearly fore-

sees an employment relationship. 42 U.S.C. § 12111(8).

■ Overall, the determination of what constitutes an employer-employee relationship under the ADA is not evident from the statute. To answer this question, Johnson cites the "economic realities" test we used in *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir.), *cert. denied*, 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992). The city argues that the *Lilley* test was superseded by the Supreme ·Court's decision in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), which propounded a common-law agency test. For its part, the district court held that Johnson lost under both tests.

■ We hold that the proper test is the common-law test suggested by the city and *Darden*. Although *Darden* was an ERISA case, it stands for the proposition that when a statute has left a term undefined, has left no hint in the legislative history of its intended meaning for the terms, and the term has "accumulated settled meaning" under the common law, there is a presumption that Congress meant to incorporate the common-law definition into the statute. *Darden*, 503 U.S. at 322, 112 S.Ct. 1344. The *Darden* Court noted the use of this principle in a Copyright Act case, and extended it to ERISA. It is a rule of general applicability. *See Ware v. United States*, 67 F.3d 574 (6th Cir.1995) (applying *Darden* to Internal Revenue Code's definition of "employee").

In this case, the ADA uses the same sort of vague definition of employee and employer found in ERISA. *Compare* 42 U.S.C. § 12111(ADA) *with* 29 U.S.C. § 1002 (ERISA). The only statement on this question from the legislative history is not helpful, simply saying that the ADA definitions parallel those in Title VII (42 U.S.C. § 2000e *et seq.*), which are similarly vague. *See* H.R. REP. No. 485, 101st Cong., 1st Sess., pt. 3, at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 445 ["House Report"]. Therefore, we apply *Darden* to the ADA, and use common-law principles of agency and the master-servant relationship to determine if Johnson is eligible for the ADA's protections. *See Birchem v. Knights of Columbus*, 116 F.3d

310, 312–13 (8th Cir.1997) (applying *Darden* to ADA).

In a recent case, we applied *Darden* instead of *Lilley*, but recognized that in practice there is not much difference between the two standards—both consider the entire relationship, with the most important factor being the "employer's ability to control job performance and employment opportunities of the aggrieved individual." *Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1862, 137 L.Ed.2d 1062 (1997). Later in the same case, we listed applicable *Darden* factors:

> [T]he hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Simpson*, 100 F.3d at 443 (*citing Darden*, 503 U.S. at 323–24, 112 S.Ct. 1344).

In *Ware*, however, we made it clear that while it is appropriate to apply *Darden* to many other statutory contexts, there is no one catch-all set of standards; a court should examine all incidents of the alleged employee/employer relationship, with the relative weight given to the various factors in the common-law analysis depending on the nature of the statutory context. *Ware*, 67 F.3d at 578.

■ With the principles from these cases guiding us, then, we can evaluate the district court's determination that, as a matter of law, Johnson was not an employee. Using those *Darden* factors that apply here, it certainly appears that the district court was correct. Johnson had a contract with the city (initially through his corporation) to provide services, and the contractual relationship reads unmistakably as one with an independent contractor as opposed to one with an

employee. Johnson himself said that he came and went largely as he pleased, and to the extent that he did not, because he had to cover official city functions, this is no more probative of an employee relationship than of contractual obligations. Johnson hired and fired his own staff. He was paid irregularly if at all by the city, on an ad hoc basis, and he got most of his money from the advertising revenue he himself mustered. The city provided no employee benefits to Johnson, and Johnson considered himself self-employed for tax purposes.

Admittedly, the city did control some aspects of the station's operations. In particular, the city controlled the facilities, owned most (but not all) of the equipment in the studio, and did not charge rent. In his deposition, Johnson referred to a particular official as his "supervisor," and claimed that the official had asserted authority over him. Johnson claims that the city therefore controlled his ability to work, especially when it began exercising control more strongly, demanding that Johnson increase the amount of programming and keeping Johnson from employing an associate of his who had troubles with the law. But these appear just as strongly to be the acts of a party to a contractual relationship, if perhaps a close working relationship.

Therefore, we conclude that Johnson was not employed by the city, and affirm the district court's dismissal of Johnson's Title I claim.

### III

#### A

Title II of the ADA mandates that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The district court found this provision to be inapplicable, since the studio was not open to the public like, say, a park, and so was not a service, program, or activity of a public entity. Johnson, the court also said, was not a member of the public seeking accommoda-

tion; he controlled the operations of the station himself. The district court also held that Johnson had not provided adequate notice to the city of his requirements. Johnson argues on appeal that the district court improperly ignored the language at the end of § 12132, which forbids *any* discrimination of any sort against Johnson, by a public entity, so long as Johnson is a qualified individual with a disability (QID).

■ We need not consider whether Johnson's argument is correct, for we reach a similar result by other means. We conclude that (1) the discrimination referenced in the statute must relate to services, programs, or activities; and (2) services, programs, and activities include all government activities, including contracting such as that in this case.

The definition of a QID relates the discrimination referenced in § 12132 back to "services, programs, or activities." A Title II QID is:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities* provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added). If the prohibition on discrimination in § 12132 goes beyond services, programs, and activities, it is quite unclear how we would determine if a plaintiff is a QID. *But see Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 44–45 (2d Cir.1997) (applying anti-discrimination provision to "all discrimination by a public entity, regardless of the context").

However, we must acknowledge that our conclusion—that the discrimination forbidden by § 12132 must be with regard to services, programs, or activities—is for the most part a distinction without a difference. This is because we find that the phrase "services, programs, or activities" encompasses virtually everything that a public entity does.

Title II itself does not define "services, programs, and activities," but several other sources lead us to our conclusion. First of all, the word "activities," on its face, suggests great breadth and offers little basis to exclude any actions of a public entity.

■ Second, this broad reading of "programs, services, and activities" is consistent with the broad definition used in § 504 of the Rehabilitation Act ("the term 'program or activity' means all of the operations"). 29 U.S.C. § 794(b). This is significant, because we look to the Rehabilitation Act for guidance in construing similar provisions in the Americans with Disabilities Act. *See McPherson v. Michigan High School Athletic Ass'n, Inc.,* 119 F.3d 453, 459–60 (6th Cir.1997) (en banc); *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1177 (6th Cir.1996); *Patton v. TIC United Corp.,* 77 F.3d 1235, 1245 (10th Cir.), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2525, 135 L.Ed.2d 1049 (1996); House Report at 50 (1990), 1990 U.S.C.C.A.N. at 473 ("The Committee intends that title II work in the same manner as Section 504.").

Next, we note that the Department of Justice regulations interpreting Title II also require a holding that Johnson has stated a valid claim under Title II. Congress gave the Attorney General the task of developing regulations to implement Title II. 42 U.S.C. § 12134(a); *see* House Report at 52, 1990 U.S.C.C.A.N. at 475 ("Unlike the other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section is to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited."). Because of this express delegation, these regulations are entitled to "controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this case, the regulations provide in relevant part that "[a] public

entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(5).[1]

This application of Title II to public contracting is bolstered and somewhat broadened by a section in the Department of Justice's Technical Assistance Manual, which as an interpretation by the Department of its own regulations is entitled to substantial deference. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The section provides that "[a] public entity may not discriminate on the basis of disability in contracting for the purchase of goods and services." TITLE II TECHNICAL ASSISTANCE MANUAL, § 3.7100.

■ To summarize, "programs, services, and activities," include all of the activities of a public entity. The ADA and its regulations forbid the city from discriminating against people who are, with reasonable accommodation, qualified to "participate" in contracting with the city to provide services.

■ In this case, Johnson has raised sufficient disputed issues of material fact, and the district court should not have dismissed his Title II claim on summary judgment. FED. R.CIV.P. 56(c). We cannot conclude from the record that the city's motives were proper when it ended its relationship with Johnson. Johnson's replacement was obviously less qualified than Johnson, and he was less successful in running the station than was Johnson, which is significant because one of the sticking points in the negotiations was the city's demand for an increase in programming. Furthermore, it is apparent (or at least sufficiently disputed) that Johnson's relationship with the city broke down in June over his request for better facilities; that it was clear he had *some* sort of disability; and that as of an earlier (February) broadcast on his station, Johnson publicized (sufficiently,

---

1. We also note another potentially relevant regulation, 28 C.F.R. § 35.130(b)(4), which declares that "[a] public entity may not, in determining the site or location of a facility, make selections ... [t]hat have the effect of excluding individuals with disabilities from, denying them the benefits

of, or otherwise subjecting them to discrimination...."

In addition, the preamble to the regulations states that "[t]itle II applies to anything a public entity does." 28 C.F.R. Part 35, App. A. (discussing 28 C.F.R. § 35.102).

at least, to survive summary judgment) his limitations.[2] In short, we cannot conclude as a matter of law that the city's decisions—not to move the station, and not to continue its relationship with Johnson—did not violate Title II.

Our decision today should not be read too broadly. At least one important limit to the reach of Title II remains. Title II only requires *reasonable* accommodation; otherwise, the would-be plaintiff is not a QID. *See* 42 U.S.C. § 12131(2). If the city had neutral "essential eligibility requirements" that Johnson could not meet even with accommodation, it would not be liable. Thus, for instance, the city would not have to contract with Johnson if a requirement that all contracts go to the lowest bidder established an "essential eligibility requirement" that Johnson's "reasonable accommodation" would make his bid unable to meet. *Cf. McPherson*, 119 F.3d at 459–60 (allowing public-school athletic association to use neutral age requirements that had effect of excluding older, learning-disabled students). We do not purport to reach the merits here; this question is for the district court to answer.

### B

■ We also note that the city is not exempt from Title II's requirement that it provide reasonable accommodations to members of the public. The district court held that because the facility was not generally open to the public, Title II did not apply. For this proposition, it cited *Torcasio v. Murray*, 57 F.3d 1340, 1346 n. 5 (4th Cir. 1995), *cert. denied*, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), a case that held that Title II did not apply to prisons.

Besides being wrong that the station was closed to the public,[3] the district court erred in its general view of the breadth of Title II. After the district court's decision, however, the Supreme Court rejected the *Torcasio*[4] view of Title II in *Pennsylvania Dep't of Correc. v. Yeskey*, —— U.S. ——, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), holding that Title II protection extends to state prisoners, and ignoring any public/private distinction. As discussed above, Title II is broadly applicable to all of the activities of a public entity. This requirement is subject, as also discussed above, to the bounds of reasonableness. We cannot conclude in this case, however, that the state established as a matter of law that no reasonable accommodation was required or alternately that no reasonable accommodation was possible.

■ The district court also erred by barring Johnson's claim on the grounds that he operated the station, and thus that only he was responsible for providing reasonable accommodations, while the city was not. The city, not Johnson, determined where the studio was to be located. Though it was run by Johnson, the station was located in a city building, and operated there rent free. It is clear from the Technical Assistance Manual construing Title II that public entities have a duty to provide accessible facilities even when those facilities are used by contractors. As noted above, the Manual is entitled to substantial deference for this interpretation of Title II. The Technical Assistance Manual gives the specific example of a city-owned building in which the first floor is leased by private businesses. Even though the businesses may be subject to Title III of the ADA (42 U.S.C. § 12181 *et seq.*, regarding public accommodations), the city is simultaneously subject to Title II because it is a

2. Because of this last fact, we decline to explore further what kind of notice Title II requires plaintiffs to provide.

3. The station was open to the public in the sense (among others) that guests on shows produced at the studio needed to climb the stairs. On one occasion, for instance, former Governor and State Supreme Court Justice John Swainson, a double amputee, had to struggle mightily to reach the studio to appear in a program.

4. Before the Supreme Court's decision in *Yeskey*, several other courts had attempted to limit Title II's application to prisons. *See, e.g., Amos v. Maryland Dep't of Pub. Safety & Correc. Svcs.*, 126 F.3d 589 (4th Cir.1997), *vacated and remanded*, —— U.S. ——, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998); *Aswegan v. Bruhl*, 113 F.3d 109 (8th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997). *But see Crawford v. Indiana Dep't of Correc.*, 115 F.3d 481 (7th Cir. 1997) (Posner, J.) (holding that ADA does apply to prisoners).

landlord. TITLE II TECHNICAL ASSISTANCE MANUAL, § 1.3000. This section applies here: the city definitely is a landlord, required by Title II to reasonably accommodate the disabled public.

Furthermore, because of the city's role in providing the space and the equipment for the station, the station may be considered a "public entity" under the regulations. The Manual makes the following point:

> Where an entity appears to have both public and private features, it is necessary to examine the relationship between the entity and the governmental unit to determine whether the entity is public or private. Factors to be considered in this determination include—
>
> (1) Whether the entity is operated with public funds;
>
> (2) Whether the entity's employees are considered government employees;
>
> (3) Whether the entity receives significant assistance from the government by provision of property or equipment; and
>
> (4) Whether the entity is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials.

TITLE II TECHNICAL ASSISTANCE MANUAL, § 1.2000. Although some of these factors do not apply (we have already held, for instance, that Johnson was not a public employee), the third factor is highly relevant. We do not mention this section of the Manual in order to establish a four-pronged balancing test— among other things, the list quoted above is of "consider[ations]," and non-exclusive ones at that. Rather, we hold only that the district court was unduly dismissive of Johnson's claims.

We leave it to the district court to determine on the merits whether the station is a public entity and the city is thereby subject to liability, or whether the city is subject to liability merely as a landlord. This distinction may factor into the district court's determination of whether or not the city is actually liable in this case (a question we do not purport to have answered here), since the reasonableness of an accommodation may depend on the context in which the city is providing it.[5]

Based on the foregoing, then, we conclude that the district court erred in dismissing Johnson's Title II claims on summary judgment.

## IV

### A

Parenthetically, the city argues that Johnson's "total disability" Social Security status forecloses any remedy under the ADA. Its argument is that if Johnson represents himself as totally disabled with regard to Social Security, he cannot represent that he is a qualified individual under the ADA. This argument is foreclosed by our decision in *Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376 (6th Cir.1998), *petition for cert. filed*, 66 U.S.L.W. 3800 (U.S. June 9, 1998) (No. 97–1991).

### B

The final question on appeal is whether the district court was correct in holding that Johnson could not bring an action for damages under the ADA, and alternately, if he could, that such a claim would be barred in his case by the doctrine of "avoidable consequences." Specifically, Johnson sought compensatory and punitive damages for "physical damage ..., psychological and

---

**5.** The district court also said that the city had no notice of Johnson's limitations. However, the district court then went on to point out that the city did have notice of his limitations, albeit late in the life of the relationship. Furthermore, the city knew that the building was not readily accessible to disabled people generally, as evidenced by a buzzer and a sign it provided to allow disabled visitors to obtain assistance in going up to the studio.

Johnson points out that the notice requirements of Title I, *see* 42 U.S.C. § 12112(b)(5)(A), are not explicitly included in Title II, *see* 42 U.S.C. § 12132. However, as mentioned above, *see supra* note 2, we decline to address the bounds of any notice requirements of Title II because we find that there was clear notice in this case, sufficient at least to survive summary judgment.

emotional trauma, humiliation and embarrassment, anxiety, and pain and suffering." Although Johnson sought these damages under both his Title I and Title II claims, only the latter survives, and so we will explore the availability of damages only for his Title II claim.

The remedial section of Title II of the ADA, 42 U.S.C. § 12133, incorporates by reference the "remedies, procedures, and rights" provisions of the Rehabilitation Act found at 29 U.S.C. § 794a. Section 794a offers two sets of remedies, one for employment discrimination (§ 794a(a)(1)), and one for discrimination by entities providing federal assistance (§ 794a(a)(2)). This two-part division reflects a parallel two-part division in the Rehabilitation Act, between employment-based complaints (in 29 U.S.C. § 791) and broader discrimination (in 29 U.S.C. § 794, also known as § 504 of the Rehabilitation Act). As discussed above, Title II of the ADA parallels § 504 of the Rehabilitation Act, and so we will apply the second set of remedies, presented in § 794a(a)(2), to this case.

Section 794a(a)(2), in turn, incorporates the remedies, procedures, and rights provisions of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*). Therefore, if a claim for compensatory damages analogous to Johnson's would be permitted under § 504 of the Rehabilitation Act or under Title VI, we will permit it in this case.

We have made a previous decision that is decisive as to one aspect of this question—punitive damages are not available under § 504 of the Rehabilitation Act, and so are not available to Johnson under Title II of the ADA. *See Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir.1996) (en banc).

The punitive damages issue was the only one we formally reached in *Moreno*, though we noted there that "federal courts have long held that compensatory damages may be awarded" for violations of § 504, and we were untroubled by that portion of the award. *Id.* at 784. We formalize these dicta today, and hold that compensatory damages are available under Title II of the ADA, by extension from their availability under the Rehabilitation Act and Title VI.

In *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court held that compensatory damages are available under Title IX. Specifically, the Court cited the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 70–71, 112 S.Ct. 1028. The Court further found that Congress did not intend to limit that general rule in the case of Title IX. *Id.* at 71.

Given that Title IX parallels Title VI very closely, *see Cannon v. University of Chicago*, 441 U.S. 677, 694–95, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the reasoning of *Franklin* extends to Title VI and, transitively, to § 504 of the Rehabilitation Act and Title II of the ADA. *See also Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (holding, before *Franklin*, that compensatory damages are available for intentional violations of Title VI). Indeed, each of our sister circuits reaching the question has held that compensatory damages are available for violations of § 504. *See W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir.1994); *Rodgers v. Magnet Cove Pub. Sch.*, 34 F.3d 642, 645 (8th Cir.1994); *Waldrop v. Southern Co. Svcs.*, 24 F.3d 152, 157 n. 5 (11th Cir.1994). Even before *Franklin*, we reached this conclusion with regard to § 504, albeit in an unpublished decision. *See Cook v. Hairston*, 948 F.2d 1288, No. 90–3437, 1991 WL 253302, *4 (6th Cir. Nov. 26, 1991) (unpublished per curiam).

■ In dismissing this portion of Johnson's claim, the district court in this case also relied on the tort doctrine of "avoidable consequences," perhaps better known as the requirement of mitigation of damages. The court held that, because Johnson himself chose to violate his medical restrictions, he could not charge the city with liability for the resulting damages. However, this analogy from tort law is inapt, for two reasons. First, the doctrine of avoidable consequences does not apply to intentional or continuous

**574**

torts, to which the city's actions appear analogous. *See Kratze v. Independent Order of Oddfellows,* 442 Mich. 136, 500 N.W.2d 115, 119 n. 2 (1993) (citing *Allen v. Morris Bldg. Co.,* 360 Mich. 214, 103 N.W.2d 491, 493 (1960)). Second, and more directly, we cannot conclude at the summary-judgment stage that, if Johnson had done everything within his power to mitigate his damages, these damages would have been eliminated in their entirety.

Therefore, we hold that the district court erred in disallowing Johnson's claim for compensatory damages under Title II of the ADA.

### V

Based on the foregoing, we AFFIRM the district court's dismissal of Johnson's claims under Title I, and his request for punitive damages, but VACATE and REMAND for further proceedings with regard to Johnson's Title II claim, including compensatory damages.

MOORE, Circuit Judge, concurring in part.

I concur in the majority opinion with one exception. The last paragraph of part III A of the majority includes a sentence regarding the hypothetical intersection of lowest-bidder contracting requirements and reasonable accommodations for disabilities. This sentence does not pertain to any facts or legal issues presented in this appeal. This sentence is pure dictum; it is totally unnecessary and irrelevant to our disposition of this case. In other respects I concur with the majority.