NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0653n.06
Filed: October 21, 2008

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 07-2214

---

DIXIE JANETTE,                                  )
                                                )
    Plaintiff-Appellant,                        )
                                                )
                v.                        )    ON APPEAL FROM THE
                                                )    UNITED STATES DISTRICT
AMERICAN FIDELITY GROUP, LTD.,                  )    COURT FOR THE EASTERN
UNIVERSITY PAYROLL SYSTEMS, TOM                 )    DISTRICT OF MICHIGAN
PARKER GENERAL AGENCY, UNIVERSAL                )
FIRE & CASUALTY INSURANCE CO.,                  )
AMERICAN INVESTORS, INC., & UNIVERSAL           )
HOLDING CORP.,                                  )
                                                )
    Defendants-Appellees.                       )

---

BEFORE: DAUGHTREY and McKEAGUE, Circuit Judges, and VAN TATENHOVE,[*] District Judge.

**VAN TATENHOVE**, District Judge. Dixie Janette challenges the district court's grant of summary judgment in favor of her employer as to her claim for discrimination under the Americans

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

with Disabilities Act.[1]  Before reaching the merits, the district court concluded that Janette was an

independent contractor, and as such, was not protected by the ADA.  We affirm.

I.

Dixie Janette worked for a bail bonding company, American Fidelity Group, Ltd. ("AFG"),

from 1999 to December 2004 as a W-2 employee.[2]  She received benefits (e.g., vacation, sick leave,

health insurance) and AFG deducted payroll taxes from her salary.  Although she only received a W-

2 from AFG, her responsibilities included accounting work for the other Appellees[3] as well.  Prior

to beginning her employment with AFG, she had more than a decade of experience in the accounting

profession.  With only a high school diploma, much of her knowledge and skill has come from "on-

the-job" training, although she has taken several Dun & Bradstreet accounting seminars.

During her time as an employee, Janette's primary responsibilities included accounting and

bookkeeping.  Working in the various offices operated by the Appellees, Janette reconciled bank

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. §1291 because the district court's grant of summary judgment was a "final decision."  Jurisdiction in the district court was proper under 28 U.S.C. §1331 because the claim under the ADA raised a federal question.

[2]The record here is limited.  Apparently, a number of depositions were taken, but Janette switched counsel and transcriptions were not ordered for purposes of appeal, save the depositions of Janette.

[3]Universal Payroll Systems is a corporate assumed name of AFG and not a separate entity. (Appellee Br. 2).  Tom Parker General Agency ("TPGA") and Universal Fire & Casualty Insurance Company ("UFCIG") provided insurance for the bail bonding companies.  (JA 21).  American Investigators ("AI") is a private investigating company and Universal Holding Corporation ("UHC") is a holding company.  (*See id*.).

accounts, maintained the books of the company, and prepared tax returns and monthly financial statements. Although there was no specific job description, she described herself as an accounting supervisor. She did not, however, do payroll and is not a Certified Public Accountant.

In December 2004, Janette voluntarily resigned. Diagnosed with Crohn's Disease and Fibromyalgia, Janette felt she had too many day-to-day responsibilities that required her to work more than she should to still maintain her health. Despite her resignation, Janette continued to have conversations with the Appellees. In mid-January 2005, Janette and Pete Loughrin, an admitted agent of the Appellees, reached an alternative "agreement" whereby Janette would return to work on behalf of the Appellees. Although the parties never executed a written contract, Loughrin composed an email outlining the terms of the arrangement:

> Dixie will do the payroll for all employees every other week for a flat fee of $250 for each payroll. This is a substantial savings from the prior system. This cost will be borne by UPS and will be part of the "charge back" that UPS does for the other companies.

> At the conclusion of each payroll period, Dixie will "bill/invoice" each company for their share of the payroll cost. Payroll cost is equal to the wages plus the taxes plus the $250 and other costs paid for by UPS. Dixie will "bill/invoice" AFG, TPGA, UFC, and AI and even UHC as appropriate. Dixie will need input from you guys as to the payroll allocation...Please help Dixie with the %-age allocations.

> Dixie will handle all UFC administrative and secretarial duties for a flat fee of $1,200 per month. Tom provided her with a detailed list of duties that she is responsible to accomplish for this $1,200. The list includes working with John Pastor and Professionals Direct; working with BDO Siedman and the auditors; computing the inter-company invoicing and preparing the monthly reconciliations.

> No one else needs to work on the UFC books.

> Dixie will be paid as an independent contractor (DLJ Accounting or some such thing). She will be entitled to no benefits; no holiday pay, no vacation pay.

Dixie will also train Michelle and oversee the closing of the books for November, for December and for January for all of the companies. She will "direct traffic" and train. Dixie is to minimalize her actual "work product" but Dixie is the one who IS RESPONSIBLE to PROVIDE TO EACH OF US reconciled and accurate Financial Statements for all companies for all months. She is to be paid up to $600 per week for these services. It is Dixie's responsibility to make sure that Michelle and Cindy and Tom and whomever ... get their jobs done! Dixie can then give each of us a "November Packet" and a "December Packet", etc.

. . .

Monthly "Packets" are to be provided to each of us every month in the future!

If it works, it can continue indefinitely. If it does not work, then changes will be made.

Dixie is the best person to do payroll, to train Michelle, to coordinate the operations of all locations and to oversee the production of the monthly Financial Statements. BUT, Dixie is not the best person to actually do the day-to-day transactions and the day-to-day data entry and monthly bank reconciliations. She needs to be more focused and task-master oriented in order to actually make sure that THINGS GET DONE and DONE IN A TIMELY MANNER.

Email from Pete Loughrin to Tom Parker, Jeff Kirkpatrick, Matthew Maddock and Dixie Janette.

(Jan. 18, 2005)(copy on file in Joint Appendix at 75).

Janette admits that she agreed to, negotiated and understood the arrangement, and understood what it meant to be an independent contractor. Consistent with the new agreement, Janette's responsibilities and status changed. For example, prior to January 2005, the payroll was performed by an outside, independent company called Paychex. Janette now had that sole responsibility. In addition, rather than come into an office every day, she worked from her home, and utilized her personal computer to log into the company server and remotely perform her responsibilities. Although the decision was hers, Janette advised Tom Parker and others, by email, when she intended

4

to be physically in the office. Janette decided that some "regular" time in the office would be necessary to complete the training of Michelle and noted that she would set that up, but was not required to do so. In sum, she worked whatever hours or times were necessary to accomplish the respective tasks. Further, she received no benefits (holiday, vacation, insurance) and received 1099 forms for income tax purposes. She submitted invoices for the work she performed and did so under the name "DLJ Accounting Services." Some invoices included descriptions of the work she performed and some did not. At no time did those invoices exceed the amounts described in the "agreement" and she never submitted "overtime." One email, however, reflects that Janette assisted another employee in preparing payroll and for which she believed she should be compensated, but that she would "negotiate" the amount.

This arrangement continued until June 2005, when she resigned. During those six months, Janette underwent surgery and took a great deal of time off and worked primarily from home. In addition, she admitted that she was unable to complete many of the required tasks and got behind. Although her resignation was voluntary, Janette contends that she was "constructively" discharged.

## II.

This Court reviews legal conclusions *de novo*. Because a grant of summary judgment is made as a matter of law, the district court's order granting summary judgment is also reviewed *de novo*. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004); *Thompson v. Williamson County, Tennessee*, 219 F.3d 555, 557 (6th Cir. 2000). In other words, we apply the same standard as that applied by the district court.

Case No. 07-2214
*Janette v. American Fidelity Group, Ltd., et al*

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See also Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citations omitted). A fact is considered "material" only if its resolution will have some affect on the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986). Stated alternatively, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. Importantly, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co*. 886 F.2d 1472, 1479-1480 (6th Cir. 1989) (citation omitted).

Title I of the ADA prohibits discrimination against individuals with disabilities in the context of the employment relationship:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

6

42 U.S.C. § 12112(a). A "covered entity" is defined as an "employer, employment agency, labor organization, or joint labor-management committee" and "employer" means "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. § 12111(2), (5)(A). An employee is "an individual employed by an employer." *Id*. at § 12111(4). While it is clear that application of the ADA requires the existence of an employer-employee relationship, *see Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998), the circumstances constituting that relationship are not defined specifically by statute. Therefore, a court looks either to the express agreement of the parties, or to the common law principles of agency. *Johnson*, 151 F.3d at 568; *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992). Analysis of the common law factors is a mixed question of law and fact, a determination that the trial judge normally makes as a matter of law. *See Lilley v. BTM Corp.*, 958 F.2d 746, 750, n.1 (6th Cir. 1992).

A.

In general, we look to any express agreement between the parties as to their status as it is the best evidence of their intent. *See e.g.*, *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004) (noting the value of a contract in determining the parties' intention to create independent contractor relationship); *Simpson v. Ernst & Young*, 100 F.3d 432, 442 (6th Cir. 1996); *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218 (6th Cir. 1992) (upholding express agreement which declared individual to be an independent contractor). In this case, however, the only evidence of an "agreement" was an email from Loughrin to the Appellees outlining the terms of what he and Janette had "decided." Janette was "cc'd" on the email. There are no signatories to the email and it does

7

not appear that the parties entered into any formal agreement which memorialized the terms of their arrangement. Other than their performance, there is no evidence that either party agreed to terms as they were outlined. Therefore, the district court correctly concluded that no express agreement existed between the parties.[4]

B.

Because no express agreement existed between the parties as to Janette's status, we look to the common law. In this circuit, when a statute fails to define a term - in this case, employee - then courts may look to the common law for guidance. *Johnson*, 151 F.3d at 568; *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992). The Supreme Court has articulated a multi-factor test which we have adopted:

> [T]he hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)). In *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004), we added

---

[4]Nonetheless, the fact that the parties' performed under those terms provides evidence in support of an independent contractor relationship. *Ware v. United States of America*, 67 F.3d 574, 576-77 (6th Cir. 1995) (noting that there is "'no shorthand formula or magic phrase'; a court must assess and weigh 'all of the incidents of the relationship...with no one factor being decisive.'") (citing *NLRB v. United Ins. Co. of Amer.*, 390 U.S. 254, 258 (1968)); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (same). While the district court did not address this issue specifically, our precedent suggests that such evidence appropriately may be considered in the analysis.

two additional factors: (1) the source of the tools and instrumentalities used and (2) whether the hiring party is in business.[5] Even still, there is no exact set of standards and a court should examine all incidents of the relationship and give relative weight to the factors.[6] *Ware v. United States of America*, 67 F.3d 574, 576-577 (6th Cir. 1995) (noting that there is "'no shorthand formula or magic phrase'; a court must assess and weigh 'all of the incidents of the relationship...with no one factor being decisive.'") (citing *NLRB v. United Ins. Co. of Amer.*, 390 U.S. 254, 258 (1968)); *Darden*, 503 U.S. at 324 (same).

1.

The control, or "means and manner" factor is a derivative of the Restatement principles of agency. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989). While no one factor is dispositive, this Court has repeatedly held that the "employer's ability to control job performance and the employment opportunities of the aggrieved individual" are the most important of the many factors to be considered. *Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1997)

---

[5]This test replaces the "economic realities" test we previously articulated in *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992), however, "in practice, there is not much difference between the two standards - both consider the entire relationship with the most important factor being the 'employer's ability to control job performance and employment opportunities of the aggrieved individual.'" *Johnson*, 151 F.3d at 568 (citing *Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1996).

[6]Janette urges this Court to consider and adopt the "significant" case law articulated by the Eighth Circuit Court of Appeals in *Jenkins v. Southern Farm Bureau*, 307 F.3d 741 (8th Cir. 2002). Review of the sister circuit's decision, however, reveals only an opinion that utilizes the same Darden factors considered here, but reaches a different result. While instructive, it is not dispositive given the wealth of authority in this Circuit and the distinguishable nature of those facts from those in the instant case.

(citations omitted); *see also Johnson*, 151 F.3d at 568; *see also Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005).

Janette argues that the trial court erred in its finding on this factor because the Appellees set deadlines and priorities for her work, and therefore, necessarily controlled the means and manner in which she did it. Further, she argues that she was simply a "telecommuter" who was required to attend meetings set by her employers, to perform whatever tasks were assigned, to format her work (e.g., spreadsheets, comparison charts), and to complete projects that she was not free to decline certain deadlines. The Appellees, on other hand, point to evidence that Janette did have a series of projects she was required to perform, but that she completed those according to reasonable deadlines given the nature of the work As she was responsible for payroll and many accounting functions, those were the types of activities that necessitated certain deadlines and time frames for completion.

Janette attempts to create "control" based on the Appellees' request that she complete the requirements of her agreement. The email outlining her duties certainly contemplated the preparation of various financial documents, including reconciliations and payrolls. It would not be unreasonable, or necessarily require a finding of an employment relationship, for the Appellees to request that certain financial statements be prepared in advance of a meeting. There is no evidence in the record that these requests for performance were "controlled." To the contrary, the Appellees most often merely inquired about their status. All of her work was performed without supervision or intervention, other than to inquire about the status. The fact that any task took longer than Janette anticipated or desired does not alter this factor in her favor.

Further, it is clear that the parties intended Janette's role to change, and expected her to perform it independently. There are numerous emails reflecting a unilateral decision about when she would be in the office, what hours she would be working (both from home and otherwise), as well as evidence that she did so on her own time and generally at her own pace. Admittedly, Janette was asked when she would be in the office to sign certain documents or to train employees - all of which was contemplated by their arrangement and which Janette initiated. This is very different than a "requirement" that she attend meetings set by the Appellees, as Janette suggests. To the contrary, in several emails, she noted that she knew she needed to come into the office to facilitate performing certain tasks and indicated a future intent to set that up. Importantly, it was Janette who had the discretion to set those times and decide when to perform those tasks.

In addition, Janette utilized standard formatting for performing these tasks, whether it be a spreadsheet or other like method. Merely requesting that an individual comply with an entity's standard practices and use its form does not mandate the finding of an employer relationship. *Weary v. Cochran*, 377 F.3d 522, 526 (6th Cir. 2004) (citations omitted).

The important and decisive control factor weighs in favor of Janette having independent contractor status. The Appellees' control of the priority of her tasks, i.e., setting deadlines and formatting requirements, does not amount to the level of control regarding the "means and manner" of her work product to warrant a finding of employee status. Accordingly, the district court did not err when it concluded that even viewing the facts in favor of Janette, this factor weighed in favor of independent contractor status.

11

2.

As for the skill required by the Appellee, Janette argues that she is neither educated highly, nor does she have specialized skills or knowledge that weigh in favor of an independent contractor. She challenges the district court's finding that her skills were marketable to the Appellees, and suggests that the consideration should be more generalized. The Appellees, on the other hand, cite a number of cases for the proposition that "accounting" is a skilled profession.

The test for this factor is "not the amount of skill required but, rather, whether the skill is an independent discipline (or profession) that is separate from the business and could be (or was) learned elsewhere." *Weary v. Cochran*, 377 F.3d 522, 532 (6th Cir. 2004). Clearly, Janette has acquired a number of skills relating to general accounting and bookkeeping work, both as it relates to these Defendants-Appellees, and generally. In fact, her work history demonstrates that she has held numerous jobs for various employers doing exactly this kind of work for more than a decade. Thus, it is not unreasonable to conclude that she has skills in this regard that she learned (or could have learned) elsewhere. In fact, she ostensibly operated DLJ Accounting Services where she could have performed a number of these same tasks for other parties. The payroll is one such example, given that the Appellees were utilizing an independent contractor to perform this function before transferring it to Janette. Accordingly, the district court did not err in finding that Janette was a skilled individual meriting independent contractor status.

3.

As an initial matter, we note that the duration of the parties' relationship is afforded little weight, and particularly so when the other factors overwhelmingly favor a finding of independent

12

contractor. Nonetheless, in evaluating this factor, "the Court is not concerned with the length of the relationship, but rather, when hired, whether the relationship was one of a long-term at-will employee or one to complete a particular task in a specified time-frame." *Lantz v. United States Postal Service*, No. 2:05-cv-207, 2006 WL 2882347, *1, *3 (6th Cir., Oct. 5, 2006).

Janette asks this Court to bootstrap the time of her W-2 employment in order to assess the duration of their relationship, a request the trial court declined. We agree. Janette resigned in December 2004 thereby terminating any previous status she may have had. The entire impetus for her return was that the circumstances of her "employment" changed. Therefore, the appropriate period to consider is January-June 2005.

Moreover, Janette had specified tasks to complete by certain time periods. While the email outlining the agreement indicated that it could continue indefinitely, the email also reflected the ability to alter the terms of the arrangement if it proved unworkable. This apparent willingness and ability to alter the terms arguably favors independent contractor status. We decline to hold that the potential for an indefinite "contractual" relationship that required the performance of "repeated" tasks necessarily warrants a finding of employer status.

4.

Although the trial court concluded the Appellee's right to assign additional projects weighed in favor of employee status, it noted that it "barely supports the indicia of an employment relationship." This conclusion was based on Appellees' request that Janette perform tasks such as type letters and run labels for a hockey team.

13

Janette agrees with the trial court's finding, but argues that it should have been assigned greater weight. Appellees, on the other hand, contend that any "request" that she perform additional tasks is entirely different than the "right" to assign them. Moreover, they submit an affidavit stating that they did not believe they had the right to assign anything additional.

Janette fails to submit any evidence that the Appellees had the *right* to assign her additional tasks. If any such requests were made, Janette had a right to decline them or negotiate for additional pay. In her deposition, she admitted that she would be comfortable billing Appellees for any additional work and did so on one occasion. She negotiated payment for assisting another employee in performing a payroll task. Moreover, emails between Janette and Loughrin reflect a strong preference that she decline additional tasks and avoid the "day-to-day" work she had been performing as a W-2 employee. Her decision not to do so cannot now be held against the Appellees. On these facts, and given the half-hearted weight the trial court gave this finding, we hold that this factor weighs in favor of independent contractor status.

5.

Because Janette worked primarily from home at hours she established, the trial court concluded that the discretion Janette had over when and how much work weighed in favor of independent contractor status. For the reasons articulated as to the "control" factor, we affirm the district court finding as to this factor as well.

6.

Janette argues that the trial court did not view the manner of her compensation in the proper context. Likewise, she argues that the fixed monthly amount was paid regardless of the time she

14

spent on each task and therefore is more akin to a salaried employee. She believes that the invoicing was merely the product of the business sophistication of the Defendants-Appellees to avoid certain tax consequences. The Appellees agree with the trial court's finding that flat fee arrangements as well as invoicing support an independent contractor relationship.

As a general matter, lack of a consistent salary supports a conclusion that one is an independent contractor. *See Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004) (citations omitted). Specifically, payments by invoice and flat fees are common indicators of an independent contractor relationship. *Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir. 1987); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 910 F.Supp. 225, 229 (E.D. Pa. 1996). Here, Janette utilized both in lieu of a salary. She was paid a flat fee for payroll, up to $600 for her work in training other individuals, and a flat $1200 fee for the accounting services she provided for the companies generally. This amount varied depending on the number of payrolls she completed, as well as any training she may or may not have completed. In addition, if she did not submit an invoice, she did not receive remuneration. Such an arrangement differs markedly from a salaried employee who receives a certain dollar amount for any number of tasks regardless of the time spent or number completed. Therefore, as the district court concluded, this factor weighs in favor of independent contractor status.

7.

Janette argues that she had no authority to hire her own assistants, but that the Appellees possessed such authority. Appellees, however, note that Janette was free to do so, at her own

15

expense, if she chose. At first glance, it appears this factor favors neither party, but after careful consideration, we find that it favors independent contractor status.

Janette posits that she had no hiring authority, but there is no support for that proposition in the record. The email outlining the arrangement does not prohibit it, and the Appellees do not refute her ability. She certainly could have hired assistants, at her own expense. Moreover, the fact that she had no hiring authority over the assistants of Appellees weighs in favor of independent contractor status. Had she had some disciplinary or supervisory authority over those who worked for Appellees, it would support an employer/employee relationship. Therefore, although the trial court found this factor did not weigh in favor of either party, we conclude it supports independent contractor status.

8.

Janette argues that accounting and financial services are integral to any business such that her performance of those functions makes her more appropriately characterized as an employee, particularly given that others actually employed by Appellees do similar work. We disagree.

It is undisputed that AFG is a bail bonding company, AI performs private investigations, TPGA and UFCIG provides insurance for the bail bonding companies, and UHC is a holding company. Janette performed accounting services which are not part of the Appellees' regular business. The fact that financial services are integral to the operation of any business does not merit a different conclusion.

Moreover, the fact that Appellees may have utilized employees to perform services similar to those contracted out to Janette is not dispositive. *See e.g.*, *Trustees of Resilient Floor Decorators*

*Ins. Fund v. A&M Installations, Inc*., 395 F.3d 244, 250 (6th Cir. 2005) (rejecting argument that use of employees and independent contractors to perform same work is an indication that workers were "misclassified" as independent contractors). Thus, the trial court correctly concluded this factor weighs in favor of Appellees, and independent contractor status.

9.

Because Janette did not receive benefits typical of employee status such as insurance or holiday/vacation pay, the trial court held that this factor weighed in favor of concluding Janette was an independent contractor. Janette does not dispute the trial court's finding as to this factor.

10.

It is undisputed that Janette received 1099s for her work, and the trial court held that this factor required a finding of independent contractor status. Again, Janette does not dispute the trial court's finding as to this factor.

11.

Janette contends that her use of the Appellees' software, network, and programs, even when she worked remotely from her own computer favors employee status. Further, she argues that most of her work was completed from the office and that she used "paperwork" of the Appellees. We disagree, but affirm the trial court decision that this factor favors neither party.

Janette worked primarily from home, using her own computer, but utilized the network and programs of the Appellees in order to facilitate their practices and needs. While she certainly used their "paperwork," we are not persuaded that the actual financial records themselves are a tool or

instrumentality. Thus, upon balance, we agree that this factor does not weigh in favor of employee or independent contractor status.

12.

The trial court correctly noted that whether the hiring party is in business is not particularly relevant. This factor does not weigh in favor of either party because a hiring party is almost always in business. Although Janette challenges this finding, her argument has no support in the relevant case law of this Circuit. *See e.g.*, *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004) (noting that this factor is "irrelevant" and "unhelpful" to the analysis).

III.

Because there was no express agreement between the parties, the district court correctly applied the common law multi-factor test to determine whether Janette was an employee or an independent contractor. Although there is no "magic phrase," a review of all "incidents" of the relationship between Janette and the Appellees requires a conclusion that she was an independent contractor. *Ware v. United States of America*, 67 F.3d 574, 576-577 (6th Cir. 1995). Accordingly, viewing all facts in her favor, we conclude that Janette is not an employee entitled to ADA protection.

For these reasons, we **AFFIRM**.