*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0251P (6th Cir.)
File Name: 04a0251p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

JOHN WEARY,
      *Plaintiff-Appellant,*

    *v.*
            No. 03-5143

WILLIAM S. COCHRAN, et al.,
      *Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-01121—Thomas A. Wiseman, Jr., District Judge.

Argued: March 9, 2004

Decided and Filed: July 29, 2004

Before: MARTIN and CLAY, Circuit Judges; MILLS,
District Judge.*

───────────────

### COUNSEL

**ARGUED:** Angus Gillis III, SCHULMAN, LEROY &
BENNETT, Nashville, Tennessee, for Appellant. Winston N.

───────────────

    * The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

1

2    *Weary v. Cochran, et al.*    No. 03-5143

Harless, LEWIS, KING, KRIEG & WALDROP, Nashville,
Tennessee, Robert E. Boston, WALLER, LANSDEN,
DORTCH & DAVIS, Nashville, Tennessee, for Appellees.
**ON BRIEF:** Angus Gillis III, Ashley N. Arnold,
SCHULMAN, LEROY & BENNETT, Nashville, Tennessee,
for Appellant. Winston N. Harless, John Roy Tarpley,
LEWIS, KING, KRIEG & WALDROP, Nashville,
Tennessee, Robert E. Boston, Stanley E. Graham, WALLER,
LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for
Appellees.

MARTIN, J., delivered the opinion of the court, in which
MILLS, D. J., joined. CLAY, J. (pp. 12-29), delivered a
separate dissenting opinion.

───────────────

### OPINION

───────────────

BOYCE F. MARTIN, JR., Circuit Judge. John Weary
appeals the district court's dismissal of his complaint alleging
claims under the Age Discrimination in Employment Act, 29
U.S.C. § 621 et seq., and under Tennessee state law against
Northwestern Mutual Life Insurance Company and William
S. Cochran. For the reasons that follow, we AFFIRM.

### I.

Northwestern Mutual Life Insurance Company markets its
products through "General Agents," who in turn contract with
"Special Agents." Northwestern Mutual hired William S.
Cochran as its General Agent and granted him the exclusive
contractual right to market Northwestern Mutual products in
Tennessee. Cochran's insurance agency was located in
Nashville and, as of January 2000, had nearly one hundred
Special Agents under contract. Weary served as one of those
Special Agents from 1973 until 2000.

The contract governing Weary's business relationship with Cochran, called the "Full-Time Special or Soliciting Agent's Contract," provided that the "Agent [Weary] shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company [Northwestern Mutual], General Agent [Cochran], or First Party [Cochran]." Weary was paid solely upon a commission basis, and agreed to meet certain minimum selling standards set by Northwestern Mutual and Cochran. Cochran set higher standards than Northwestern Mutual, as he was permitted to do, and when Weary failed to meet his minimum earnings standards in 1998 and 1999, Cochran fired him. At the time of his termination, Weary was over forty years of age. Weary filed a claim with the Equal Employment Opportunity Commission, asserting that he was impermissibly terminated because of his age. The Commission found, however, that no employer-employee relationship had existed. Thus, the Commission closed its file and issued a right to sue letter.

Weary then filed the instant complaint against Northwestern Mutual and Cochran, asserting claims under the Age Discrimination in Employment Act, as well as state law claims for breach of contract, breach of the duty of good faith and fair dealing, fraud in the inducement to contract and negligent or intentional misrepresentation. The district court awarded summary judgment in favor of Northwestern Mutual and Cochran on the federal age discrimination claims, holding that neither qualified as Weary's "employer" within the meaning of the Act. Having dismissed the federal claims, the district court also dismissed the state law claims for lack of jurisdiction.

## II.

The sole issue in this appeal is whether Weary was an "employee" of Northwestern Mutual or Cochran within the meaning of the Act. In analyzing the district court's resolution of this issue, we employ de novo review, using the same standard under Federal Rule of Civil Procedure 56(c)

used by the district court. *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In viewing the evidence, we must draw all reasonable inferences in favor of Weary, as the nonmoving party. *Shah*, 355 F.3d at 49.

Like other federal employment discrimination statutes, the Age Discrimination in Employment Act protects employees, but not independent contractors. *Shah*, 355 F.3d at 499; *Simpson v. Ernst & Young*, 100 F.3d 436, 438 (6th Cir. 1996). The determination of whether a plaintiff qualifies as an employee under the Act "is a mixed question of law and fact" that a judge normally can make as a matter of law. *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992). As a general matter, this Court has repeatedly held that insurance agents are independent contractors, rather than employees, in a variety of contexts. *See, e.g., Ware v. United States*, 67 F.3d 574 (6th Cir. 1995) (insurance agent was an independent contractor for tax purposes); *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245 (6th Cir. 1989) (insurance agent was an independent contractor under ERISA); *Plazzo v. Nationwide Mut. Ins. Co.*, No. 88-4016, 1989 WL 154816 (6th Cir. Dec. 22, 1989) (unpublished opinion) (same). Other courts are in accord with this view. *See, e.g., Butts v. Comm'r of Internal Revenue*, 49 F.3d 713 (11th Cir. 1995) (insurance agents were independent contractors for tax purposes); *Oestman v. Nat'l Farmers Union Ins.*, 958 F.2d 303 (10th Cir. 1992) (insurance agent was an independent contractor under the Age Discrimination in Employment Act).

We have recently clarified that the proper test to apply in determining whether a hired party is an employee or an independent contractor under the Act is the "common law agency test" set forth in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 322 (1992). *See Shah*,

355 F.3d at 499. In *Darden*, the Supreme Court described the common law agency test as follows:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-34; *see also Shah*, 355 F.3d at 499-500; *Simpson*, 100 F.3d at 443. "Since the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324. Of the applicable *Darden* factors,[1] the vast majority weigh in favor of characterizing Weary as an independent contractor, rather than an employee.

The crux of *Darden*'s common law agency test is "the hiring party's right to control the manner and means by which the product is accomplished." 503 U.S. at 323. This is a broad consideration that is embodied in many of the specific factors articulated in *Darden*. Our analysis of those factors –

---

[1] The parties agree that the factor relating to whether the hiring party is in business is irrelevant and unhelpful to this analysis, as almost any hiring party is in business.

which is set forth below – reflects upon, and is relevant to, this core issue of control. Before turning to those specific factors, however, we consider in a more general manner the extent to which Northwest Mutual or Cochran had the right to control the manner and means by which Weary marketed and sold life insurance policies.

We begin by noting two pieces of evidence that shed light on how the parties themselves viewed the nature of their working relationship. First, the Special Agent Contract characterized Weary as an "independent contractor" and explicitly cautioned that "nothing herein shall be construed to make [him] an employee" of Northwestern Mutual or Cochran. This evidence, while not dispositive of the issue, is certainly relevant to the inquiry. *See, e.g., Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218 (6th Cir. 1992) (emphasizing that a cosmetic salesperson's employment agreement "unambiguously declared [her] to be an independent contractor"); *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, (6th Cir. 1989) (noting the significance of the employment agreement's characterization of the plaintiff insurance agent as "an independent contractor and not an employee"); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993) (the fact that the consultant agreement stated that the plaintiff was hired as an independent contractor was "probative of the parties' intent" regarding the nature of the employment relationship).

Second, Weary admitted in his deposition that he intended to be an independent contractor:

> Q. So by contract, you agreed that you were an independent contractor and not an employee of Mr. Cochran or Northwestern Mutual, correct?
>
> A. According to this document and what I was led to believe, *the answer is yes*, but the law says if one party has control over the other party, then it doesn't make any different what the parties to the contract

call themselves, you have an employer/employee relationship.

Q. What I get confused about that, Mr. Weary, is going back to your initial comments . . . in essence, you intended that to be true, correct?

A. That's correct. But I –

Q. *You have intended to be an independent contractor, didn't you?*

A. *I did.* But the law changed the contract.

(Emphasis added).

In addition to this evidence concerning the parties' intent, the record is replete with other evidence – much of which Weary himself has admitted – indicating that Weary was an independent contractor who, for the most part, had the right to control – and did, in fact control – the manner and means by which he accomplished his own work. For example, and as discussed in greater detail below in connection with the more specific *Darden* factors, Weary was paid solely on a commission basis; he was free to take other jobs – and, in fact, sold insurance policies for approximately fourteen other insurance companies; he set his own hours and could take vacation at his leisure; he employed his own staff and paid them out of his own pocket; he decided whom to solicit for business; he paid for his own office space, equipment, supplies, car and travel expenses; and he kept his own financial records and monitored his own profit and loss. This is just a sampling of the abundant evidence in the record pointing toward independent contractor status.

We recognize, as the dissent points out, that Weary's independence was not entirely unrestrained. He was required, for instance, to comply with applicable legal and ethical rules and certain administrative guidelines set out in a Northwest

Mutual manual. That limited authority that Northwest Mutual retained over these aspects of Weary's work, however, is "not the type of control that establishes an employer/employee relationship." *Oestman*, 958 F.2d at 306 (finding plaintiff to be an independent contractor despite being required to obtain permission from the defendant before advertising any of defendant's products). *See also Ware*, 67 F.3d at 576 (holding that an insurance salesman was an independent contractor despite being required to comply with various guidelines set by the insurance company); *Kirby v. Robby Len Swimfashions*, 904 F.2d 36, at **3 (6th Cir. 1990) (Table) ("While [defendant] required orders and paper work to be administered on [its] forms and in conjunction with [its] practices, the infringement of [plaintiff's] discretion in the affairs of his business by these requirements was minimal"). Northwestern Mutual's authority over those aspects of Weary's operations is understandable, *see Oestman*, 958 F.3d at 306 (reasoning that defendants "have a substantial interest in controlling the advertising of their products because [they] may be liable for [the plaintiff's] misstatements or misrepresentations"), and does not undermine our conclusion that, in general, Weary controlled the manner and means by which he performed his job.

The more specific factors articulated in *Darden* also favor characterizing Weary as an independent contractor. The first factor relates to the skill required to perform the job in question. In *Schwieger v. Farm Bureau Insurance Co.*, 207 F.3d 480, 485 (8th Cir. 2000), the court found that this factor "weigh[ed] heavily in favor of independent contractor status" where the insurance agent "considered herself an insurance professional: she was licensed by the state of Nebraska at her own expense, was subject to a code of professional ethics, and had been certified by professional associations." In this case, Weary admitted that the sale of insurance is a "highly specialized field," requiring considerable "training," "education" and "skill." He also admitted that a state license was required in order to sell insurance and that he had taken licensure examinations in "several" states. Weary held a

specialized "Series VI" license for the sale of securities, a Chartered Life Underwriter certification and a business administration degree. Thus, this factor weighs in favor of independent contractor status.

Second, the source of instrumentalities and tools used in Weary's business was Weary himself, not Northwest Mutual or Cochran. Weary admits that he paid for and procured his own office equipment, internet and phone service, postage, copies and automobile. He also paid for meals with prospective clients and for his attendance at professional training courses.

Third, with respect to the location of Weary's work, he admits that he worked either at his home office or at commercial office space that he rented at his own expense. He did not work at offices owned or controlled by Northwestern Mutual or Cochran. Therefore, this factor weighs in favor of independent contractor status. *See Wolcott*, 884 F.2d at 251 (relying upon the fact that an insurance agent owned and maintained his own office condominium in finding him to be an independent contractor).

Fourth, Weary admits that neither Northwestern Mutual nor Cochran had any authority or discretion regarding when or how long he worked, except to require him to attend periodic compliance meetings and sales meetings and to meet minimum selling standards. Weary was free to take vacation at his leisure and did not report his hours to anyone.

Fifth, the fact that Weary was paid solely upon a commission basis and did not earn a salary lends further support to the conclusion that he was an independent contractor. *See, e.g., Ware*, 67 F.3d at 578; *Wolcott*, 884 F.2d at 251.

Sixth, with regard to the hiring and paying of assistants, Weary admits that he employed his own staff at his own

expense, had sole discretion in hiring, firing and compensation matters, and withheld and remitted taxes to the federal government in his capacity as the employer of his staff members. Weary points out that his affidavit states that Cochran required him to hire and maintain a secretary for twenty hours per week and if he did not, he would suffer a reduction in his expense allowance. That fact is insignificant, however, because it says nothing about whether Northwestern Mutual or Cochran played any role in hiring or paying Weary's assistants. The affidavit only alleges that Cochran required *Weary* to hire and pay a secretary to work at least twenty hours per week.

The seventh and eighth factors relate to the provision of benefits and tax treatment. Weary places particular emphasis on the fact that Northwestern Mutual provided him certain pension and health benefits and that it withheld social security taxes from his commissions. As the district court held, however, the Internal Revenue Code permitted Northwestern Mutual to provide those benefits and to withhold those taxes because of Weary's status as a non-employee. *See, e.g.,* 26 U.S.C. § 3121(d) (permitting a "full time life insurance salesman" who is not a common law employee to be deemed an employee "for purposes of this chapter" – i.e., Chapter 21, Federal Insurance Contributions Act); 26 U.S.C. § 7701 (a)(2) (permitting a "full time life insurance salesman who is considered an employee for the purpose of Chapter 21 to be deemed a statutory "employee" who is entitled to participate in group pension and benefit plans). The district court found that Weary "admitted to being informed of his 'statutory employee' status." The district court found it even "[m]ore instructive" that Weary deducted his profits and losses on his own tax returns as a sole proprietor and declared on loan documents that he was self-employed. We agree with the district court that these factors also sway the balance in favor of independent contractor status.

While at least two factors weigh in favor of characterizing Weary as an employee – i.e., the duration of the relationship

and the fact that Weary's work was a regular part of the hiring party's business[2] – those factors do not offset the overwhelming evidence that compels the opposite conclusion.

In sum, we hold that Weary was an independent contractor, not an employee, and was, accordingly, not entitled to protection under the Age Discrimination in Employment Act. His claim under the Act having been properly dismissed for this reason, the district court was entitled, as Weary admits, to dismiss the remaining state law claims as well.

For these reasons, the district court's judgment is AFFIRMED.

---

[2]Whether the hiring party may assign additional responsibilities may also arguably weigh in Weary's favor, although it is not entirely clear that this factor is applicable under the facts of this case.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. In determining whether Plaintiff was an "employee" of NML or Cochran under the Age Discrimination in Employment Act, the majority makes two major errors. First, the majority misstates applicable law by omitting the two most important factors in the definition of "employee": the employer's ability to control job performance and the employer's ability to control employment opportunities. Both factors indicate that Plaintiff was NML's "employee." Secondly, the majority overstates the extent to which analysis of other factors yields the conclusion that Plaintiff was not an "employee" of NML. In fact, these other factors are somewhat ambiguous, but on close analysis, they favor the conclusion that Plaintiff was an "employee." These two errors lead the majority to the wrong disposition.

**I.**

The majority omits the two most important factors in the definition of the term "employee." When *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992) enumerated numerous factors (many of which are applied by the majority), the first and most important factor listed was "the hiring party's right to control the manner and means by which the product is accomplished." *Id.* at 323 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). Also, this Court, in *Lilley v. BTM Corp.*, stated a test that "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself." 958 F.2d 746, 750 (6th Cir. 1992) (citations omitted). These two tests were issued within a short time of one another, creating some confusion as to the standard for determining "employee" status.

A later case ruled on the issue of whether or not *Lilley* (filed on March 12, 1992) was overruled by *Darden* (filed on March 24, 1992) and also clarified the definition of "employee." This Court stated that *Lilley* was not overruled, because *Darden* had adopted the same standard as that in *Lilley*, for defining the term "employee":

> *Lilley*, like *Darden*, defines the underlying common denominator of the employer/employee rubric as the employer's ability to control job performance and employment opportunities of the aggrieved individual as the most important of many elements to be evaluated in resolving the issue after assessing and weighing all of the incidents of the relationship with no one factor being decisive . . . .

*Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1996). The other factors listed in *Darden* retain importance but none of the other factors is as significant as each of the two most important factors: the employer's ability to control job performance and the employer's ability to control employment opportunities. *Simpson*'s interpretation of *Darden* has been reiterated by this Court:

> for the purposes of the ADA and other Civil Rights Acts, an employer/employee relationship is identified by considering: the entire relationship, with the most important factor being the employer's ability to control job performance and employment opportunities of the aggrieved individual.

*Satterfield v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002) (citations and internal quotation marks omitted). Overall, the *Darden* test, as interpreted by this Court in *Simpson* and *Satterfield*, considers numerous factors, the most important of which are an employer's ability to control job performance and an employer's ability to control an employee's employment opportunities.

At the outset, it is worth noting that the functional standard stated in *Simpson* (and reiterated in *Satterfield*) leaves little, if any, room for considerations of contractual disclaimers of an employment relationship. This runs contrary to the majority's citation to the contract's boilerplate language attempting to disclaim an employment relationship in the present case. *See also Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 483 (8th Cir. 2000) ("The existence of a contract referring to a party as an independent contractor does not end the inquiry, because an employer may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship.") (citations and internal quotation marks omitted).

Moreover, even if the contractual disclaimer were relevant, its attempt to avoid an employment relationship is belied by terminology in other important documents. The Agents Manual of Information, distributed to Plaintiff by NML states, "As a Northwestern Mutual Life agent . . . . You are part of a company that has a reputation of being knowledgeable, caring . . . ." (J.A. at 754.) Under ordinary parlance, an independent contractor would not be considered "part of a company." Rather, only an employee would merit such designation. Thus, to the extent that terminology is relevant, it does not clearly favor NML's position.

Similarly, the majority is wrong to attribute anything more than token significance to the fact that NML initially had succeeded in convincing Plaintiff that he was an "independent contractor." Again, this is irrelevant to the functional standard that is employed in defining "employee" status. *See also Armbruster v. Quinn*, 711 F.2d 1332, 1340 (6th Cir.1983) ("Though the manner in which the parties view the relationship is some evidence as to whether the manufacturer's representative in any particular case will be deemed an 'employee' for Title VII purposes, it is not determinative of that question.").

A multi-factored, functional analysis governs this case. The analysis begins with the first of the two most important factors, the ability to control job performance. Here, it is instructive that the contract reserved for NML the right to adopt regulations limiting a Special Agent's freedom to conduct business. This provision gave NML widespread "*ability* to control job performance." *Simpson*, 100 F.3d at 442 (emphasis added).

Beyond retaining the general ability to control job performance by adopting regulations, NML's contract with Plaintiff also expressly reserved more specific mechanisms of control, and NML undertook measures, including the adoption of detailed regulations, that actually controlled Plaintiff's performance. Plaintiff's record-keeping and submitting of insurance applications were subject to review, according to NML guidelines. In the contract, NML expressly reserved the right to require Plaintiff to surrender "all records" relating to transactions to NML or to Cochran. (J.A. at 464) (item 11, Records). In the Field Management Business Conduct Guidelines, Plaintiff was advised by NML: "You must be aware of the need to prevent, detect and rectify any deviation from the 'Northwestern Mutual Way.'" (J.A. at 887.) On occasion, NML reviewed Plaintiff's records: Plaintiff received a letter from Diane Ertel, a Specialist in the Market Conduct Division of NML, critiquing Plaintiff's file-keeping and advising him of procedures that he was expected to make.

Beyond record-keeping regulations, NML exercised its ability to influence Plaintiff's daily operations in other manners. The contract provided for performance requirements instituted by NML, in addition to potentially higher requirements from a General Agent (Cochran). Thus, Plaintiff was not free to determine his own performance level, if he wished to maintain his relationship with NML. Also, NML's "Fastrack Agents' Self-Study Guide" provided detailed rules regarding the use of e-mail and the internet. For example, NML stated, "Illustrations may not be sent via

e-mail." (J.A. at 871.) E-mail solicitations and other solicitations were subject to NML review. (J.A. at 871) ("Any variable product-related e-mail that is sent to multiple individuals, either collectively or individually, and which repeats the same central message or theme is considered sales material. As such, it must be reviewed and approved before use as described above."). Plaintiff was not allowed to develop his own illustrations for presentations, independently of NML. (J.A. at 760) (agent's manual, stating, "To ensure accuracy, use only illustrations produced through the Northwestern Mutual LINK proposal system."). Plaintiff was subject to precise rules on proper sales presentations. (J.A. at 760) ("Do not . . . characterize a lower-than-current-scale illustration as a 'worst case' scenario . . . ."). As can be seen, these rules were highly detailed and specific; they governed daily operations.

The second key factor, the employer's ability to control employment opportunities, evaluates whether the individual is free to engage in other employment, outside of a given relationship. In the present case, written permission from Northwestern Mutual Investment Services, LLC ("NMIS"), an affiliate of NML, was required for any outside business activity, including unpaid activities and including activities unrelated to the insurance business. The "Fastrack Agents' Self-Study Guide" states:

> Before you engage in any "outside business activity" which is not a part of your normal insurance and securities business, you must obtain written permission from NMIS [Northwestern Mutual Investment Services, LLC]. This is required whether or not compensation is received for the activity. Note the NASD requires all outside business activities to be disclosed on Form U-4 Outside business activities include, but are not limited to:
>
> Full-time, part-time, or self-employment of any sort away from Northwestern Mutual and NMIS. . . . .

Becoming a trustee, director, officer, partner, etc. of any organization or business, *(public or private)* including churches and charitable organizations.

Participating in multi-level marketing programs. Examples include Amway, Mary Kay, Prepaid Legal Services, Inc./The People's Network (PPLSI/TPN), Rexall Showcase, etc.

(J.A. at 873) (emphasis in original).

The contract also contains a relevant provision on "exclusive dealing":

Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit it will issue on them or who are otherwise not acceptable for insurance by the Company . . . .

(J.A. at 464.) Both provisions quoted here grant NML the ability to limit and control Plaintiff's employment opportunities.

But the exclusivity issue merits further analysis. As the majority points out, in addition to selling Northwestern Mutual insurance policies, Plaintiff also sold policies for numerous other insurance companies. Plaintiff's work for other insurance companies might be taken to show that Plaintiff had other employment opportunities.

However, the standard in question is the employer's *ability* to control such opportunities. The regulation and contract language quoted above evince NML's "ability" to limit outside employment, regardless of whether NML actually chose to exercise this ability. The record does not contain written permission requests, but they may have been made

and granted–otherwise, presumably NML and Cochran could have asserted this as the reason for the termination, instead of failure to meet production requirements. If Plaintiff did not obtain such permission, then Plaintiff breached the contract–this might provide grounds for a separate legal action by NML, but this does not prove that NML lacked the ability to control employment opportunities, in the context of analysis of the standard for "employee" status. The contractual language clearly granted NML the ability to control Plaintiff's outside work opportunities.

Moreover, there is no clear indication that Plaintiff's sales work for other companies constituted "employment opportunities," as opposed to "independent contractor" opportunities. By the definition of "employment" here, there is no evidence that the other insurance companies controlled the manner and means of job performance or required written permission for Plaintiff to sell insurance for NML or other companies. In fact, the other sales relationships appear to have been more minimal: the other insurance companies did not pay Social Security, retirement benefits, or health insurance; nor did the other companies have production requirements. Because these relationships with other companies were more limited than Plaintiff's relationship with NML, it is obvious that if any of the other relationships were of an *employment* nature, then so too was Plaintiff's relationship with NML. As a result, there is no way in which Plaintiff's work for other companies can be cited as illustrating NML's lacking the ability to control Plaintiff's employment opportunities.

Hence, it is clear that NML maintained the *ability* to control employment opportunities, notwithstanding the possibility that NML may have granted written permission for Plaintiff to engage in *independent contractor* work for other companies and notwithstanding the possibility that Plaintiff (by failing to get written permission) breached contractual provisions relating to NML's ability to control outside work.

Hence, both of the key factors favor of the conclusion that Plaintiff was NML's employee.

## II.

The other *Darden* factors must be considered, although none of them is as important, individually, as either of the two key factors analyzed above. *Satterfield*, 295 F.3d at 617; *Simpson*, 100 F.3d at 443.

### i. The skill required

The majority errs in defining this factor as relating to the amount of skill required to do a job. (It goes without saying that many individuals are employed in jobs that require an extremely high skill level.) The legal issue here is not the amount of skill required but, rather, whether the skill is in an independent discipline (or profession) that is separate from the business and could be (or was) learned elsewhere. *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 550 (7th Cir. 2002) ("Dr. Hojnacki did not derive her medical skills from her employment with the DOC."); *Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir. 2000) ("First, regarding 'the skill required,' Schwieger does not dispute that throughout her relationship with Farm Bureau she considered herself an insurance professional: she was licensed by the state of Nebraska at her own expense, was subject to a code of professional ethics, and had been certified by professional associations. Thus, this factor weighs heavily in favor of independent contractor status."); *Mulzet v. R.L. Reppert, Inc.*, 2002 U.S. App. LEXIS 27369, at *3 (3rd Cir. Dec. 11, 2002) ("The first factor, the skill required, cuts in [alleged employer] Reppert's favor. The District Court found that the skill required to hang drywall was based on Mulzet's many years of independent experience, rather than any teaching by Reppert.") (unpublished) (citations omitted).

The skill of selling insurance is best conceived of as general one, not specific to NML's business. This explains Plaintiff's

contemporaneous work selling insurance for other companies. On the other hand, Cochran helped to train Plaintiff, through weekly performance reviews, monthly training meetings, annual seminars, and other meetings. (J.A. at 1202.) Thus, Plaintiff's skill was not acquired independently of his relationship with NML–although, for the reasons explained in the second *Darden* factor, below, the training from Cochran begs the question of Plaintiff's status.

Still, on balance, because the skill of selling insurance is a general one, the majority may be correct in its conclusion that this factor favors independent contractor status.

### ii. The source of the instrumentalities and tools

Plaintiff worked in Cochran's office for approximately six years, where presumably Plaintiff used Cochran's office supplies and facilities. The use of Cochran's tools and instrumentalities begs the question of whether Plaintiff was an "employee." Due to the similarities in Cochran's and Plaintiff's contracts and positions, it is indisputable that if Plaintiff was "employee" of NML, then so too was Cochran. If Cochran was an "employee" of NML, then the tools and instrumentalities that he offered to Plaintiff can be attributed to NML. Although neither party briefed the issue of Cochran's relationship to NML, the possibility that he was an employee of NML must be entertained.

Regardless of Cochran's role here, additionally, Plaintiff cites approved and prepared marketing literature as instrumentalities and tools. Plaintiff stated in an affidavit, "Until 1992, I was required to send all supply requisitions for NML products through my general agent. At all times, I had to order all stationery from NML in a form controlled by NML." (J.A. at 1202.) In turn, NML attempts to show that Plaintiff provided his own office supplies, such as computer, postage, internet, and phone service.

Given the difficulties in discerning Cochran's relationship to NML and the other ambiguous evidence, here, this factor is ambiguous.

### iii. The location of the work

Plaintiff worked in Cochran's office between 1973 and 1979. After 1979, it does not appear that Plaintiff worked in an NML-affiliated office. Yet Plaintiff was required to attend regular weekly and monthly meetings with Cochran, which presumably were at Cochran's office or an NML office. Also, Plaintiff testified that he was required by Cochran to rent commercial office space, instead of telecommuting. Again, all of this involves Cochran and thus begs the question of Plaintiff's relationship with NML, for the reasons stated under the second *Darden* factor.

Also, this factor is of limited significance, given the prevalence in our current economy of arrangements whereby employees telecommute (from home or other remote locations). *E.g.*, Susan J. Wells, *For Stay-Home Workers, Speed Bumps on the Telecommute*, N.Y. Times, Aug. 17, 1997, *available at* http://commtechlab.msu.edu/Humans/heeter/PortalReports/ NYTimesTelecommute.html ("Forty-two percent of companies of various sizes have telecommuting arrangements, according to a 1996 study of 305 North American business executives by the Olsten Corp., a Melville, N.Y., staffing services company. . . . Estimates of the number of American telecommuters range from 9 million to 42 million."). This factor is not cited as relevant in *Simpson*, 100 F.3d at 443.

This factor yields no clear conclusion and is of limited importance.

### iv. The duration of the relationship between the parties

It is undisputed that there was a long relationship between the Plaintiff and both Defendants, lasting from 1973 to 2000. (The district court acknowledged this.)

### v. Whether the hiring party has the right to assign additional projects to the hired party

There is no indication that NML or Cochran had the right to assign additional projects. This factor favors NML.

### vi. The extent of the hired party's discretion over when and how long to work

Requirements as to what hours or how many hours an employee must work help to establish control of an individual. Although there were no precise requirements of what hours or how many hours Plaintiff had to work, there were work quantity requirements that are the very subject of this lawsuit–the contract contains NML requirements and General Agents' (allegedly discriminatory, in the present case) sales requirements, above those required by NML. In fact, these work quantity requirements almost certainly imposed de facto requirements over what hours and how many hours must be worked. In practice, a certain minimum number of hours would generally be needed in order to have a reasonable chance to meet the performance requirements. Additionally, if a Special Agent is nearing a performance evaluation deadline, then he may have to work on a given afternoon, to have a chance at meeting the performance requirements.[1]

---

[1] Plaintiff never sets forth this precise reasoning in his brief. Thus, the majority claims that Plaintiff admits that, aside from meetings, NML exercised no control over hours. But, given that Plaintiff has presented all of the relevant evidence, this Court is not at all bound by Plaintiff's failure to make the precise argument as to performance requirements dictating

Also, Plaintiff's work in Cochran's office between 1973 and 1979 imposed actual time constraints–Cochran would penalize Plaintiff for not having *a secretary* for at least twenty hours per week. The work in Cochran's office, and the additional performance requirements imposed by Cochran, beg the question of Plaintiff's relationship with NML, for the reasons stated under the second *Darden* factor, above.

In addition, the exclusivity provisions referenced above, in the first part of this opinion (contractual provisions limiting Plaintiff's ability to work for other companies), imposed controls on Plaintiff's working hours.

Finally, as the majority notes, Plaintiff was required to attend periodic meetings, which, of course, meant that Plaintiff did not have discretion to decline to work at the time of the meetings.

On balance, this factor favors "employee" status: NML did not control Plaintiff's working hours, but NML's performance requirements established a high level of de facto control of hours, and NML required Plaintiff to attend meetings.

### vii. The method of payment

The contract specifies "commissions" at specified rates, with thirty days advance notice of reduction in rates. Although the contract provides for Cochran to pay the commissions to Plaintiff, it also provides that NML sets the commission rates. *Id.* Cochran was paid directly by NML, making it likely that the money he paid Plaintiff came from NML. The fact that Plaintiff was paid in commission, not salary would suggest that Plaintiff was an "independent contractor" with respect to NML. *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 251 (6th Cir. 1989); *Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 486 (8th Cir. 2000).

---

working hours.

Yet there are countervailing considerations. It is noted that Plaintiff received travel reimbursements, which might be characteristic of an employee–though perhaps independent contractors also receive such advances. But this does not appear sufficiently telling to alter the rest of the analysis of this factor. Another consideration is the "Quality Incentive Compensation" system, which appears to create bonuses and incentives that are more characteristic of an employment relationship than a piece-meal independent contractor relationship. Also, a Special Agent's renewal commissions did not fully vest until the agent worked for NML for fifteen years–this would promote a long-term relationship that would appear to be more of an employment nature.

Hence, although the factor still favors NML, since Plaintiff was paid on commission, not salary, the other considerations appear to temper the conclusion.

### viii. The hired party's role in hiring and paying assistants

Plaintiff states, in an affidavit: "Between 1973 and 1976, Mr. Cochran hired and paid for my secretary. . . . Between 1976 and 1979, Mr. Cochran's office manager hired my secretary and I was responsible for a portion of her salary." (J.A. at 1210.) After 1979, Cochran would penalize Plaintiff for not having a secretary for at least twenty hours per week. Cochran's paying for a secretary or requiring a secretary begs the question of Plaintiff's relationship with NML, for the reasons stated under the second *Darden* factor, directly above.

The majority states that Cochran's requiring Plaintiff to hire a secretary "is insignificant, however, because it says nothing about whether Northwestern Mutual or Cochran played any role in hiring or paying Weary's assistants; it only establishes that Cochran required *Weary* to hire and pay a secretary to work at least twenty hours per week." This is fallacious. Plaintiff had only a limited role in hiring assistants, if *the only*

*reason that he hired a secretary was his employer's requirement that he do so.*

Due to the ambiguities as to Cochran's relationship with NML (as described in the second *Darden* factor), there is no clear conclusion, here.

### ix. Whether the work is part of the regular business of the hiring party

The majority rightly concedes that Plaintiff was a part of the regular business of the hiring party.

### x. Whether the hiring party is in business

As the majority correctly states, this factor is of limited relevance. (This factor is not cited as relevant in *Simpson v. Ernst & Young*, 100 F.3d at 443.)

### xi. The provision of employee benefits

NML withheld Social Security and paid retirement benefits and health insurance. NML apparently set aside fund for Plaintiff that was termed the "Persistency Fee Guarantee Fund" and was governed by the Employee Retirement Income Security Act ("ERISA"). (J.A. at 862-68); (Plaintiff's Brief at 5). Also, NML offered a defined benefit plan, the Agent's Retirement Plan, also governed by ERISA. This would all favor Plaintiff.

NML suggests that it was allowed to contribute group benefits to Plaintiff and to withhold Social Security taxes only because of Plaintiff's status as an "independent contractor." NML cites two tax definitions of "employee" that include both common-law employees and insurance salespersons. 26 U.S.C. §§ 3121(d)(3)(B), 7701(a)(20). There is no support for NML's position here, in the sources cited; rather, the tax court case that NML cites indicates that Social Security taxes could be withheld for an ordinary, common-law employee. *Ewens & Miller, Inc. v. Comm'r*, 117 T.C. 263 (2001) ("For

the purposes of employment taxes, the term 'employee' includes 'any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee'. Sec. 3121(d)(2); accord sec. 3306(i).").

Nor do the tax consequences for NML appear to be relevant–the factor here is simply the provision of benefits. Ordinarily, an independent contractor would not receive benefits from any one client. Ordinarily, a full-time employee would receive benefits from an employer. Plaintiff received benefits from NML, which suggests that Plaintiff was NML's employee. NML points out that Plaintiff was not covered by a workers' compensation plan, which might temper the conclusion here a bit–but this would not change the overall conclusion that NML offered benefits to Plaintiff.

### xii. The tax treatment of the hired party

In the factor directly above, it is mentioned that NML withheld Social Security taxes, but that the statute allows a business to do this for an insurance salesperson who is not a common-law employee. Thus, the Social Security withholding does not appear to favor Plaintiff.

Plaintiff's tax returns were filed on a "Sole Proprietor" form, at times listing his "Business name" as "John F. Weary Insurance." (J.A. at 619.) Never did Plaintiff list an "Employer ID number." Plaintiff deducted business expenses, which would not have been allowed by a common-law employee. 26 U.S.C. § 62 ("The deductions allowed by this chapter (other than by part VII of this subchapter) which are attributable to a trade or business carried on by the taxpayer, *if such trade or business does not consist of the performance of services by the taxpayer as an employee.*") (emphasis added).

There appears to be additional evidence of Plaintiff's tax treatment as an independent contractor. This evidence does

not appear to be needed, as the matter appears to be clear. Plaintiff's citing to the Social Security tax withholding appears to be rendered irrelevant by NML's argument on that matter. Plaintiff appears to generally concede that his tax treatment was not one of an employee–arguing, correctly, that this factor is not dispositive in the case.[2] The factor is relevant, though.

Plaintiff was not treated as an employee of NML for tax purposes.

The *Darden* factors overall are ambiguous or else favor the conclusion that Plaintiff was an "employee" of NML. Two factors are unimportant (factor iii, the location of work, and factor x, whether the hiring party is in business). (Neither of these factors would clearly favor "independent contractor" status: factor iii is ambiguous, and factor x favors "employee" status.)

Four factors favor "employee" status. As the majority stated, factors iv (duration of relationship) and ix (part of regular business or company) favor Plaintiff's argument. Factor v favors Plaintiff's argument, because, NML's performance requirements limited Plaintiff's discretion as to working hours, NML required Plaintiff to attend certain meetings, and Cochran required Plaintiff to hire a secretary for at least twenty hours per week. Also, factor xi favors "employee" status, since benefits were provided. Likewise, four factors favor NML's position: factors i (the skill required), v (additional projects), vii (method of payment), and xii (tax treatment). Although one of the factors favoring "employee" status is slightly ambiguous (under factor v, NML only exercised de facto control of working hours), the same ambiguity exists for one of the factors favoring

"independent contractor" status (under factor i, Plaintiff's general skills in selling insurance were gleaned partly through training from Cochran).

The two remaining factors yield no immediate conclusions, due to Cochran's unclear relationship with NML. *See* factors ii (source and instrumentalities), viii (role in hiring and paying assistants). However, in all reality, it is difficult not to view these factors as favoring "employee" status. The only basis for any relationship between Plaintiff and Cochran was through NML. NML expressly delegated authority to Cochran, including specific powers, such as the ability to set performance requirements above those set by NML–this power, of course, ultimately gave rise to this lawsuit (with Plaintiff's allegations that Cochran's performance requirements were discriminatory). The personnel structure here–with a supervisor exercising control over a subordinate, sharing tools and instruments (factor ii), dictating work location (factor iii), and requiring that the subordinate hire a secretary for a minimum of twenty hours per week (factor viii)–indicates delegated control that is characteristic of corporate employment relationships.[3] To the considerable extent that Cochran controlled Plaintiff, through authority expressly delegated by NML, both Cochran and Plaintiff may have been employees of NML.

Thus, in conclusion to the analysis of the remaining *Darden* factors (aside from the two most important factors, analyzed in the first part of the opinion, above), the remaining factors that yield an immediate conclusion produce a split result, with four factors on each side. Two other significant factors appeared ambiguous, due to Cochran's role; but, upon closer scrutiny, in light of the fact that Cochran's control of Plaintiff

---

[2] Plaintiff's Brief at 23 ("even though Weary was considered an independent contractor or sole proprietor for income tax purposes, that fact is not determinative of the employment relationship under the ADEA.").

---

[3] A corporate employment relationship is also evinced by the Agents Manual of Information statement that "[a]s a Northwestern Mutual Life agent . . . . *You are part of a company* that has a reputation of being knowledgeable, caring . . . ." (J.A. at 754) (emphasis added).

was delegated and defined by NML, it appears that both Cochran and Plaintiff were "employees" of NML.

### Conclusion

The first part of this opinion set forth the two most important factors of the analysis. These factors both favored "employee" status: NML had the ability to control job performance and the ability to control employment opportunities. The second part of the opinion examined the remaining *Darden* factors (aside from the two most important ones). At most, NML might show that these remaining factors are split, on balance; however, such an ambiguous showing would not overcome the two most important factors. Moreover, in light of NML's delegation to Cochran of power to control Plaintiff's work, it does not appear that NML can even legitimately make a showing that the remaining factors are evenly split; the remaining factors, on balance, favor "employee" status for Plaintiff.

Finally, it is important to note the larger framework in which the analysis takes place. In *Lilly v. BTM Corp.*, this Court stated that "[t]he term 'employee' is to be given a broad construction in order to effectuate the remedial purposes of the ADEA." 958 F.2d at 750. This consideration is not necessary to reach the conclusion that Plaintiff was an "employee" of NML; but the principle enunciated in *Lilley* provides even more support for the conclusion that, to the extent that there are large ambiguities regarding certain relevant factors, the analysis should be resolved in favor of a conclusion that Plaintiff was an "employee" of NML. On the record before us, it cannot reasonably be argued that, on balance, the relevant factors unambiguously defeat Plaintiff's "employee" status.

For the aforementioned reasons, I respectfully dissent.