Paul L. Maloney, United States District Judge
When individuals describe themselves as independent contractors, create corporate entities to realize tax benefits from their contracts, receive fixed-rate payments for services rendered, pay taxes as independent contractors, receive no employee benefits, and maintain control over where, when, and how they perform their contract duties, there is no genuine dispute that they are independent contractors.
Because Plaintiff Karen Wheatley was an independent contractor of Defendant Michigan Works! West Central, she cannot maintain claims against it for allegedly creating a hostile work environment or for retaliation under Title VII of the Civil Rights Act of 1964 and related claims under Michigan's Elliott-Larsen Civil Rights Act. Even if Wheatley was an employee, summary judgment would be warranted on these claims, for the reasons to be explained. Finally, Wheatley's separate claim under the public accommodation provision of the Elliot-Larsen Civil Rights Act is also subject to summary judgment.
I. Background
In 2012, Plaintiff Karen Wheatley was charged and convicted of a felony for Operating While Intoxicated in violation of Michigan law. She was sentenced to probation and community service under the supervision of the Mason County Probation and Parole Office. As part of her community service, Wheatley helped parolees with employment-related activities like job *757 searching, filling out applications, resume building, and interviewing.
Wheatley proved to be a natural. Around the time her probation ended, the MDOC supervisor for Mason County, Chrysten Gregory, thought Wheatley would be a good fit to continue to work with other offenders as part of MDOC's Prisoner Reentry Program (PRP).
PRP is an MDOC initiative designed to provide "every offender released from prison ... the tools needed to succeed in the community and the opportunity to utilize those tools to be productive, self-sufficient citizens." (ECF No. 59-1 at PageID.482.) But MDOC does not handle PRP itself; it contracts with other agencies to administer the program.
One of MDOC's contract partners is Defendant Michigan Works! West Central (MWWC). MWWC assists Michigan employers by "connecting them with qualified employees and ensuring that the local talent pool meets employer needs." (ECF No. 59-40 at PageID.760.) MWWC employs around 15 people and also contracts with a number of additional people which it refers to as "providers." (Id. ) During the relevant period, MWWC had a contract with MDOC to administer the PRP in several counties in Western Michigan. (Id. )
Accordingly, when Wheatley finished her community service, Gregory contacted MWWC to see if it would be interested in hiring Wheatley. Specifically, Gregory talked to Angie Sprank, one of MWWC's Community Coordinators. (ECF No. 66-5 at PageID.961- 62.) As such, she acted as an intermediary between MDOC mangers, supervisors, parole agents (who were responsible for referring eligible parolees to MWWC) and MWWC personnel. (ECF No. 59-40 at PageID.760-61.)
Gregory told Sprank that Wheatley had been doing a good job providing employment services to other offenders and asked if Wheatley could join MWWC to continue providing those services. (ECF No. 66-5 at PageID.961-62.) The way Gregory and Sprank saw it, hiring Wheatley provided two advantages: They knew that Wheatley was capable of performing the job duties because of her community service, and they thought she represented a success story for PRP that could benefit its participants because she had successfully reintegrated into the workforce. (ECF No. 66-2 at PageID.894.)
Since Wheatley had a criminal record, Sprank first inquired with with MDOC to see if it would permit someone with a criminal record to work as an employer specialist with PRP. (ECF No. 59-41 at PageID.820; ECF No. 59-40 at PageID.761.) MDOC responded that as long as the provider was not currently on parole or probation, it was not a problem. (Id. )
In October 2014, MWWC Executive Director Paul Griffith offered Wheatley a one-year contract, and she accepted. (ECF No. 59-40 at PageID.761.) Wheatley did not interview for the position, did not receive any formal training or orientation program, nor did she receive an employee handbook. (ECF No. 66-2 at PageID.894.)
The contract memorialized the expectations for MWWC's relationship with Wheatley. As a "provider" she would be required to:
• provide services that assist[ ] in the preparation of designated-parolees for employment, and result in the employment of a designated parolee
• provide billing and verification under the terms and timing specified [by the contract]
• provide services and follow the requirements of the Michigan Prisoner-Reentry *758 Program and Michigan Works! West Central.
(ECF No. 59-2 at PageID.485-86.)
MWWC agreed to pay Wheatley fixed-rate fees for providing "Job Readiness Services" and/or "Job Search/Job Development" so long as certain criteria were met. (Id. at PageID.486.) For example, Wheatley would receive payment for providing job readiness services to a parolee so long as she provided a minimum of four services over the course of at least two in-person contacts. (Id. ) However, Wheatley was allowed to use her discretion to determine which of eight possible services were best deployed for each particular participant. (Id. ) Similarly, Wheatley could only be compensated for Job Search/Job Development tasks if she completed one task-such as helping a parolee obtain proper attire for interviews-and the program participant then began a job that paid at least minimum wage for twenty or more hours per week. (Id. at PageID.486-87.)
The contract further explained that MWWC was not offering any other benefits of employment to Wheatley, and that it was under no obligation to provide any minimum number of referrals to her. (Id. at PageID.487.)
After executing the contract, Wheatley began work. She would receive referrals from MDOC parole agents and would then arrange for an initial meeting with the parolee. (ECF No. 66-2 at PageID.895.) Often, she would meet the participant at the parole offices. This practice had a number of benefits. For instance, Wheatley could arrange meetings for the time before or after a participant met with his or her parole officer, which minimized transportation issues. (Id. ) And for high-risk offenders, MDOC required that all PRP activities take place at parole offices for safety reasons. (Id. at PageID.903.) But outside of the high-risk offenders, Wheatley had discretion to meet participants at Michigan Works! offices in Western Michigan, at parole offices, or other appropriate places. (Id. ) On a few occasions, she worked with parolees at public libraries because the libraries provided better access to computers for filling out job applications. (Id. )
After Wheatley provided employment services under the terms of her agreement, she was required to provide various reports and billing information back to MWWC. (Id. at PageID.896.) MWWC placed an emphasis on reporting because the reports Wheatley and the other providers generated were then incorporated into reports that MWWC owed to MDOC by the terms of its contract as a PRP contract-holder.
In late 2015, Wheatley's original contract expired, and the parties memorialized two new agreements. (ECF No. 59-3.) But by this time, Wheatley was acting in her capacity as President of Community Heart, Incorporated, an S-Corp that she had created to realize tax benefits from her work. (ECF No.66-2 at PageID.897.) Per the terms of the first contract, labeled "Independent Contractor Agreement for Resource Navigator ," MWWC agreed to pay Community Heart $550 per month for services performed relating to housing and support services for inmates in nine Western Michigan counties (the "RN Contract"). (ECF No. 59-3 at PageID.496-500.) If the title did not make clear that that Community Heart was an independent contractor, the contract also specified that there was not an employer-employee relationship between the parties. (Id. at PageID.498.)
The second newly-executed contract was a continuation of the original agreement between Wheatley and MWWC. (Compare ECF No. 59-2 with ECF No. 59-3 at PageID.501-13.) In other words, Community Heart, in place of Wheatley, would be paid for providing the same job readiness services *759 and job search/development services as the original contract (referred to by the parties as the "ES Contract"). (See ECF No. 59-3 at PageID.501.)
The ES Contract also doubled as an application, in which Wheatley explained her history of providing employment services. (Id. at PageID.505.) At the time she completed the application, she wrote in the section for "Applicant Information" that she was currently "independently contract[ing], serving as an Offender Employment Specialist (Service Provider) serving individuals released from prison & currently on parole who are designated Prison ReEntry." (Id. ) Wheatley then explained the particular types of services she provided, which counties she had worked with, and to whom she had provided the services. (Id. )
Shortly after agreeing to the new contracts, Wheatley entered into a new business relationship with the Area Community Services Employment and Training Council (ACSET). (ECF No. 66-3.) ACSET, like MWWC, partnered with MDOC to administer a segment of the PRP. Under this separate agreement, Wheatley agreed to provide Employment Readiness and Housing Provider Services for the West Shoreline Prisoner Reentry Program. This contract also specified that Wheatley operated as an independent contractor.
At some point in 2015, Wheatley began providing employment services to Oceana and Newaygo Counties and met an MDOC probation agent named Megan Myers. (ECF No. 66-2 at PageID.897.) Wheatley said that she saw Myers with some frequency but, based on the nature of her work, it varied on a week-to-week basis. (Id. )
In the Spring of 2016, Myers allegedly began to sexually harass Wheatley. At first, Wheatly took no action, hoping that Myers would stop harassing her. But Myers did not stop.
On May 4, 2016, Wheatley text messaged Sprank and asked whether Sprank had ever needed to "report an Agent's behavior." (ECF No. 59-5 at PageID.567.) Sprank responded by asking whether the behavior at issue was laziness or something inappropriate. (Id. ) Wheatley indicated that she was talking about inappropriate behavior, and eventually told Sprank that an agent-later revealed to be Myers-had asked her "if I had a phone # that is safe in case this person wanted to send me a picture of a pussy." (Id. ) Wheatley added that there had been "other innuendos & little things too." (Id. )
Sprank responded with a flurry of messages, stating that the harassment Wheatley had experienced was "something that needed to be reported to the supervisor. [It was] beyond inappropriate." (Id. ) She asked how Wheatley wanted to handle the issue but explained that it was "not something that she could allow to go unreported." (Id. )
In response, Wheatley said, "I'm afraid it won't go anywhere. You are not oblivious to the things that occur in these Counties & how quickly things get so ugly - I don't want any part of it. This isn't for the Supervisor." (Id. )
Sprank recognized "how ugly things get" but said that it did not mean that the conduct could go unreported. (Id. ) Eventually, Sprank proposed raising the harassment with an MDOC supervisor from another county and indicated that she could "handle it without going thru proper channels." (Id. ) Wheatley ended the exchange by requesting that Sprank not raise the issue with the MDOC regional supervisor before they had a chance to talk. (Id. )
Sprank then called Supervisor Rita Dooley, an MDOC employee who was responsible *760 for overseeing parole and probation for Muskegon County. (ECF No. 66-5 at PageID.963.) She asked Dooley how to handle a complaint of sexual harassment. (Id. ) Dooley advised Sprank that she needed to pass it on to the MDOC Regional Manager, Don Nolan.
Sprank asked Wheatley to call her on the morning of May 5, and during the call, she told Wheatley that she had reached out to Dooley. (ECF No. 59-5 at PageID.567; ECF No. 66-5 at PageID.963-64.) Sprank suggested that Wheatley draft a written statement outlining the harassment she had experienced. Wheatley drafted the statement including various harassment Myers had subjected her to, including:
• asking Wheatley if she had a phone number that was safe in case she wanted to send her a picture of a "phat pussy"
• looking at plaintiff and smiling and licking her lips
• whistling at her
• hugging Wheatley from behind
• calling Wheatley "sexy hootchie mama" and telling her she looked sexy
• tell Wheatley her high-heeled shoes were sexy
• catcalling Wheatley; and
• making a statement about Wheatley bleeding into a jar of pickles
(ECF No. 66-4 at PageID.957.) Wheatley sent the statement to Sprank, and Sprank forwarded it to MDOC Regional Manager Don Nolan, Supervisor Dooley, and Myers' supervisor in Oceana County, Bonnie Steed. (ECF No. 59-7.) About a week later, Wheatley sent another email to Sprank containing more details about the alleged harassment. (ECF No. 59-8.) Sprank forwarded this email too, indicating that Wheatley wished to add it to her prior statement.
Sprank also notified MWWC and ACSET. Paul Griffith encouraged Sprank to continue assisting Wheatley with her complaint and to keep him updated on new developments. (ECF No. 59-40 at PageID.763.)
An MDOC manager contacted Jason Furst, a Probation and Parole Supervisor for MDOC in Isabella County and assigned the investigation into Myers' conduct to him. (ECF No. 66-9 at PageID.981.) Furst had already been investigating Chrysten Gregory, and his supervisor told him that he should also investigate Wheatley's allegations regarding Myers. (Id. at PageID.981-83.) Furst had been trained to conduct investigations while working as a Supervisor for Oakland County, but the training only lasted about one full day and one halfday. (Id. at PageID.981.) Furst also had never investigated allegations of sexual harassment. (Id. ) However, he had been responsible for investigating approximately five other instances of MDOC employee misconduct. Once Furst took over the investigation, MWWC had no further involvement in the review of Myers' conduct.
After Sprank contacted MDOC to initiate a formal investigation into Myers' conduct, she continued to be supportive of Wheatley, and she took steps to limit or eliminate opportunities for further inappropriate behavior. For instance, Sprank tried to coordinate with Myers' supervisor to ensure that Wheatley and Myers were never present in the same office without a supervisor present. (ECF No. 59-6.) To make this happen, Sprank requested that Wheatley send her work schedule for the upcoming weeks. (Id. ) Sprank also requested that MDOC provide information about the investigation's process so she could provide updates to Wheatley as it progressed. (Id. ) However, Wheatley's perception *761 of Sprank began to change in late May.
Around that time, Sprank asked Wheatley to start meeting with participants outside of MDOC Probation and Parole offices. (ECF No. 66-2 at PageID.898.) Sprank said that it was partially to help Wheatley avoid Myers, but also because the Michigan State Police had audited an MDOC office and informed MDOC that all contractors needed to undergo a criminal background check because they had access to MSP's Law Enforcement Information Network (LEIN). (ECF No. 66-5 at PageID.964.) This posed a problem for Wheatley and MWWC, because MDOC required that service providers for PRP meet with high-risk offenders at MDOC's Parole and Probation offices for safety reasons. Wheatley asked Sprank how she was supposed to meet with her clients, and Sprank said that she was trying to find a solution. (ECF No. 59-11, 59-12, 59-13.)
Soon after, Sprank issued a brief memo to Wheatley, indicating that Diebel would be taking over any services that needed to be performed at Probation and Parole offices, including social support and housing services and employment services for high risk offenders. (ECF No. 59-15.) Wheatley responded, saying that she felt the reassignment of services was retaliation for her complaints. (ECF No. 59-17.) The next day, Sprank wrote an email to all service providers to advise them of the requirements for working in MDOC's Probation and Parole Offices. (ECF No. 59-18.) Because of their access to LEIN, every provider needed to be fingerprinted and background checked. If the background check cleared, they also needed to sign a security awareness form. (Id. ) Sprank requested that all providers go to the nearest county sheriff's department within the next five days for fingerprinting. (Id. )
Wheatley attempted to have her fingerprints taken on the last day, but was unaware of paperwork that she needed to bring with her. Sprank gave Wheatley a four-day extension. (ECF No. 66-5 at PageID.964.) Wheatley initially protested that she may not be able to meet even the extended deadline, but ultimately she was able to change her plans and comply with Sprank's request. (ECF No. 59-19; 59-20). However, because of her OWI conviction, she did not clear her background check. Accordingly, MDOC advised MWWC that Wheatley could not work in its Probation and Parole offices without a personal escort at all times.
In this same timeframe, Sprank received an email from another MDOC Parole Agent, informing Sprank that Wheatley had reported that a PRP participant had been sending her inappropriate texts. (ECF No. 66-5 at PageID.961; ECF No. 59-14.) The agent investigated Wheatley's allegations and saw a "red flag"-Wheatley had been texting the offender between 3:00 and 4:00 a.m. (Id. ) While none of Wheatley's messages contained inappropriate content, the parole agent was still concerned by the timing of the texts. (Id. at PageID.961-62.) Sprank consulted with Regional Manager Nolan, and they decided that all contractors should be prohibited from contacting the participants outside of normal business hours. (Id. ) Sprank issued a memo to that effect, and sent it to Wheatley and Stacey Diebel, the other employment specialist who worked with MWWC.
After these developments, Wheatley allegedly began communicating with MWWC and MDOC employees in a hostile or passive-aggressive manner. (See ECF Nos. 59-22, 59-23; 59-30.) She also began having more significant problems producing adequate reports in a timely manner. (ECF No. 59-24; ECF No. 59-25 at PageID.642-46; ECF No. 59-31.)
*762 Paul Griffith considered these developments and whether it was time for MWWC to terminate Wheatley's Employment Services contract. (ECF No. 59-40 at PageID.763-64.) He instead decided to modify her contract, and MWWC sent Wheatley a "Statement of Unilateral Modification" on July 11, 2016. (Id. ; ECF No. 59-27 at PageID.662.) Under the modified contract, Wheatley would be limited to providing services to the PRP participants with whom she was currently working. (Id. )
In August, after MWWC modified Wheatley's contract, there were some disputes over services that Wheatley had already provided, but for which she had not been compensated. (ECF No. 59-28; ECF No. 59-29; ECF No. 59-34; ECF No. 59-35; ECF No. 59-36.) Wheatley also indicated that MWWC had left five PRP participants off of her list of clients. (Id. ) MWWC asked for documentation of the additional clients and services, and Wheatley was eventually paid for them. (Id. )
On August 8, 2016, Wheatley emailed Sprank to ask about the next meeting of the Steering Team for the Prisoner Reentry Program. (ECF No. 59-33.) Wheatley believed that attending the meetings were part of her duties. (Id. ) Sprank told her that she did not need to attend. (Id. ) Wheatley continued to assert that she needed to attend the meeting, but Sprank stood her ground. (Id. ) Afterward, Wheatley complained that Sprank was "ostracizing" her. (Id. )
Wheatley's contract expired on September 30, 2016, and for the same reasons leading Griffith to modify Wheatley's contract, he chose not to renew it. (ECF No. 59-40 at PageID.763-65.) Accordingly, Wheatley's relationship with MWWC ended as of September 30, 2016. (ECF No. 66-12.)
II. Procedural Posture and Standard of Review
Wheatley filed suit on September 21, 2016, alleging that the State of Michigan, the MDOC, and MWWC violated Title VII of the Civil Rights Act and Michigan's Elliot-Larsen Civil Rights Act (ELCRA) by creating a hostile work environment and retaliating against her for reporting sexual harassment. She also alleges that MWWC violated the ELCRA by excluding her from a place of public accommodation. However, because of procedural issues with the Right to Sue letter issued by the Equal Employment Opportunity Commission, Wheatley and the MDOC stipulated to the dismissal of MDOC from this action. Wheatley subsequently refiled her claims against the MDOC in a separate civil action still pending before this Court.
The matter is now before the Court on the MWWC's motion for summary judgment. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) ; Tucker v. Tennessee , 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Bennett v. City of Eastpointe , 410 F.3d 810, 817 (6th Cir. 2005) (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *763 Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e) ; Matsushita , 475 U.S. at 586, 106 S.Ct. 1348. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson , 477 U.S. at 251-252, 106 S.Ct. 2505. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Resolution Trust Corp. v. Myers , 9 F.3d 1548 (6th Cir. 1993) (citing Anderson , 477 U.S. at 249, 106 S.Ct. 2505 ).
However, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Amini v. Oberlin College , 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. Daniels v. Woodside , 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting Anderson , 477 U.S. at 252, 106 S.Ct. 2505 ). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." Pack v. Damon Corp. , 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).
In other words, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." Fogerty v. MGM Group Holdings Corp., Inc. , 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." Id. at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Daniels , 396 F.3d at 735.
III. Discussion
A. There is no genuine dispute of fact that Wheatley operated as an independent contractor.
MWWC first argues that there is no genuine dispute of fact that Wheatley worked as an independent contractor and not as an employee. If Wheatley was not an employee, she falls outside the scope of both Title VII and the ELCRA, so summary judgment would be warranted on Wheatley's claims for creating a hostile work environment and for retaliation.[1]
Title VII provides in relevant part, "It shall be an unlawful employment practice for an employer- (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).[2]
Not all workers are covered under Title VII. The act defines "employee" to mean *764 "an individual employed by an employer[.]" 42 U.S.C. § 2000e(f). And while Title VII is construed liberally, the Sixth Circuit has held that the protections of Title VII (and other federal employment discrimination statutes) do not extend to independent contractors because they do not meet the definition of "employee." See, e.g., Shah v. Deaconess Hosp. , 355 F.3d 496, 499 (6th Cir. 2004) ("As a general rule, the federal employment discrimination statutes protect employees, but not independent contractors." (citing Johnson v. City of Saline , 151 F.3d 564, 567-69 (6th Cir. 1998) ).
Courts distinguish between employees and independent contractors by first looking to any express agreement between the parties. Janette v. American Fidelity Group, Ltd. , 298 F. App'x 467, 471 (6th Cir. 2008) (citing Weary v. Cochran , 377 F.3d 522, 525 (6th Cir. 2004) ). While such agreements are not dispositive, they are "certainly relevant" to the parties' intentions and how they themselves viewed the nature of their work. Weary , 377 F.3d at 525. After evaluating any express agreement, the Court must then look to the common law of agency. Janette , 298 F. App'x at 471 (citing Johnson , 151 F.3d at 568 ).
Under the common law agency test, courts consider:
[T]he hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
Nationwide Mut. Ins. Co. v. Darden , 503 U.S. 318, 323-24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) ; see also Shah , 355 F.3d at 499-500. "Since the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Darden , 503 U.S. at 324, 112 S.Ct. 1344. In making the determination between employee and independent contractor status, "[a]nalysis of the common law factors is a mixed question of law and fact, a determination that the trial judge normally makes as a matter of law." See Lilley v. BTM Corp. , 958 F.2d 746, 750, n. 1 (6th Cir. 1992).
1. Express Agreements between Wheatley and MWWC
Beginning at the first step, the express agreements between Wheatley and MWWC provide overwhelming evidence that each side viewed Wheatley as an independent contractor. Perhaps most significantly, both operative contracts were between MWWC and Community Heart-not Wheatley. Wheatley explained in her deposition that she created Community Heart to realize tax benefits from the income generated from the contracts. For this reason alone, it does not appear that Wheatley was "an individual employed by an employer." 42 U.S.C. § 2000e-2(a)(1).
Additionally, the RN contract was labeled "Independent Contractor Agreement for Resource Navigator ." (ECF No. 59-3 at PageID.496 (emphasis in original).) That contract also explicitly declared that "[T]his is a contracted position and the parties' agreement does not create an employer-employee relationship between the Resource Navigator and [MWWC] ...."
*765 (Id. ) Under a heading titled "Relationship of the Parties," the contract again declared that:
The Resource Navigator is an Independent Contractor with all the attendant rights and liabilities. The Resource Navigator is not an agent or employee of [MWWC] and is not entitled to benefits provided by [MWWC] to its employees..... Any provision in this Agreement or any action by [MWWC] which may appear to give the right to direct or control the Resource Navigator in performing Work means the Resource Navigator will follow the desires of [MWWC] with results of the Work only.
At least for purposes of the RN contract, the parties' intention for Wheatley's status could not be clearer.
While the ES contract lacks the same type of explicit invocation of the term "independent contractor," Wheatley's own description of her relationship to MWWC-within the contract itself-provides a great deal of clarity. Discussing her first ES contract, Wheatley stated that she "[i]ndependently contracts[,] serving as an Offender Employment Specialist (Service Provider) serving individuals release from prison & currently on parole who are designated Prison ReEntry." (ECF No. 59-3 at PageID.505.) The only meaningful difference between Wheatley's first ES contract (for 2014-2015) and her second ES contract (for 2015-2016) was Wheatley's substitution of Community Heart for herself. Accordingly, Wheatley clearly understood that her role within MWWC was that of an independent contractor.
The ES contract also contained more subtle indications that the relationship between Wheatley and MWWC was that of an independent contractor. For instance, the contract clarified that MWWC was not obligated to make any minimum number of referrals to Community Heart. (Id. at PageID.505.) It also explicitly allowed service providers to self-employ. (Id. ) Finally, the ES contract paid Community Heart on unit-prices for specific services that she needed to invoice rather than by salary or hourly rate. (Id. at PageID.502- 503.) And it vested discretion in Wheatley to choose which services to provide to each offender.
Accordingly, while the contracts memorializing the relationship between Wheatley, her company, and MWWC are not dispositive of the employer/independent contractor issue, each contract provides extremely probative evidence that the parties intended for Wheatley to work as an independent contractor. See, e.g., Weary , 377 F.3d at 525 ; Eyerman v. Mary Kay Cosmetics, Inc. , 967 F.2d 213, 218 (6th Cir. 1992) ; Wolcott v. Nationwide Mut. Ins. Co. , 884 F.2d 245 (6th Cir. 1989).
2. The Common Law Agency Test
The factors of the common law test also overwhelmingly point to the conclusion that Wheatley worked as an independent contractor. Wheatley operated her own business and was not obligated to work exclusively for MWWC. In fact, she had another contract to provide the same services to ACSET. She recognized that she was "in business for herself," reporting to her doctor that she was "self-employed in Prisoner Re-entry Programming." (ECF No. 59-37 at PageID.748.) She did not pay taxes as an employee, instead receiving 1099 forms from MWWC. (ECF No. 66-2 at PageID.894.) There is no indication that Wheatley ever filed tax forms as an employee of MWWC. MWWC provided no salary or benefits to Wheatley-instead only paying based on the invoices Wheatley submitted for services rendered. (ECF No. 59-3.) The duration of the parties' relationship also points toward independent contractor status because the parties agreed to continue their relationship via year-by-year contracts. Wheatley was *766 free to come and go as she pleased, and she had discretion when determining where to meet parolees. Wheatley also does not dispute that she had significant discretion over which services she would provide based on her assessment of each individual PRP participant. (ECF No. 66-2 at PageID.897.)
Wheatley argues that, despite what the contracts say, she was an employee of MWWC because the agency exercised control over the manner and means by which Wheatley provided services. (ECF No. 66 at PageID.873-75.)
She supports her argument by pointing to one of her contracts. That contract states that the services she provided were under the "overall direction of the Central Area Steering Team, and MIWorks! West Central as the Administrative Agency." And she says that the purpose of the contract was to "meet the requirements of the Prisoner Re-Entry Program ...." Wheatley also notes the contract provided that all employment services "would be conducted in compliance with the Agreement between MDOC and MiWorks! and in compliance with all MDOC instructions. Attendance at MDOC training and other sessions or Steering Team meetings may be required." Finally, Wheatley says that she was even subject to performance reviews , conducted quarterly, semi-annually, or annually by the "Defendant."
At first blush, this appears somewhat convincing; surely performance reviews are indicative of control by an employer. But Wheatley's argument is built on a house of cards-she relies solely on quotations from and citations to her contract with ACSET. (See ECF No. 66 at PageID.873-74.) At best, Wheatley, through her counsel, has negligently misconstrued the evidence in the case by relying on contract language from an instrument to which MWWC was not a party and which can have no relevance to its relationship with Wheatley. At worst, it represents a sloppy attempt to mislead the Court as to the materially relevant facts.
Wheatley also asserts that MWWC "controlled basically every aspect of her employment." (ECF No. 66 at PageID.873.) Wheatley supports this bold proposition with a single citation to a single page of Sprank's deposition transcript. (Id. ) There, Sprank was asked whether she retained the ability to tell Wheatley when she could meet with prisoners. (ECF No. 66-5 at PageID.966.) Sprank responded that she "provided direction on when [Wheatley] could communicate with parolees stemming from an incident in which I viewed [ ] that was inappropriate when she was communicating." (Id. ) This is obviously a reference to Wheatley texting a parolee between 3:00 and 4:00 a.m. Sprank also agreed that if she felt that Wheatley was doing something that was wrong or inappropriate, she could step in and tell Wheatley to do it differently. (Id. )
Sprank's testimony does not mitigate in favor of finding an employee/employer relationship, even in the light most favorable to Wheatley. When companies maintain limited authority over independent contractors to enforce compliance with legal and ethical rules and certain administrative guidelines, they do not transform their relationship with a contractor into an employee/employer relationship. See Weary , 377 F.3d at 526 (quoting Oestman v. Nat'l Farmers Union Ins. , 958 F.2d 303, 306 (10th Cir. 1992) ) (collecting cases); see also Kirby v. Robby Len Swimfashions , 904 F.2d 36, 1990 WL 72322 (6th Cir. 1990) (unpublished table op.) ("While [defendant] required orders and paper work to be administered on [its] forms and in conjunction with [its] practices, the infringement of [plaintiff's] discretion in the affairs of his business by these requirements was minimal").
*767 It is apparent that the type of "control" Sprank testified to is precisely of this variety. Thus, Sprank's testimony provides no probative force to her claim that MWWC exercised control over the manner and means of her work, and it falls woefully short of the premise for which it was cited-that "MWWC controlled basically every aspect of her employment."[3]
Wheatley also asserts that she "was required to report where she would be, [and] who she was working with" to MWWC. (ECF No. 66 at PageID.876.) But once again, the deposition transcript makes clear that this assertion lacks support because Wheatley's testimony was in the context of billing for services she provided:
Q. When you say you reported to [MWWC], what did you mean by that; Did you report to Paul Griffith?
A. I reported to Angie [Sprank], I reported to - in terms of billing I would have to report what I did and where I met [the PRP participants] to Brigette Reed of [MWWC].
Q. So when you reported to Brigette Reed, that wasn't so she could monitor your - days and times you were providing services, it was so that you could receive payment, correct?
A. The only way I can receive payment is by providing the days and time that I worked with someone.
Q. But she wasn't requiring that of you in a supervisory capacity, was she? She was requiring that of you so that as part of the invoice process so that you could receive payment. Correct?
* * *
Q.... Did you provide that information to her in order to trigger payment?
A. Yes.
(ECF No. 66-2 at PageID.896.) Wheatley, by the terms of her contracts with MWWC, was required to report the services she had performed in order to receive payment. It does not support an inference that MWWC exercised control over her schedule or monitored her daily activities as an employer would.
Instead, the record is replete with evidence of MWWC's lack of control over Wheatley. After Sprank learned of the sexual harassment Wheatley experienced, she emailed Wheatley, requesting a copy of her upcoming schedule-tending to show that Wheatley maintained control over her own daily schedule. Sprank did so because she planned to coordinate with Myers' MDOC-employed supervisor to ensure that Wheatley would never have to be alone with Myers. In addition, Wheatley maintained control over which services she would provide to PRP participants and where she would meet them-other than for high-risk offenders.
Finally, Wheatley asserts that MWWC exercised control over her when Sprank attempted to help her report her harassment to MDOC. There is no dispute that Sprank was highly involved as soon as Wheatley reported the harassment to her. And there is also no dispute that once Sprank forwarded Wheatley's written allegations to Don Nolan, MWWC had no control or authority over the investigation into Myers. Simply acting as an intermediary between Wheatley and MDOC for purposes of reporting sexual harassment did not create an employer/employee relationship, in light of all the other facts discussed.
*768 In sum, Karen Wheatley worked as an independent contractor for MWWC. She set up an S-Corporation specifically to realize the benefits of working as an independent contractor. She was paid and taxed as an independent contractor, set her own schedule, and used her judgment when providing services to PRP participants. She received no benefits from MWWC. She even described herself as "independently contract[ing]" in one of the contracts at issue and described herself similarly when talking to her doctor. In one email, she referred to herself as a "contract holder." Even in the light most favorable to Wheatley, no reasonable juror could find that she had an employee/employer relationship with MWWC. Summary judgment is thus warranted on Plaintiff's claims alleging that MWWC is liable for creating a hostile work environment based on Myers' harassment or for retaliation because Title VII and the ELCRA do not cover independent contractors.
B. Wheatley has not made a prima facie case for a hostile work environment claim under Title VII or the ELCRA.
Wheatley's claim against MWWC for a hostile work environment, based on Myers' sexual harassment, requires proving five elements: (1) she was a member of a protected class; (2) she was subjected to communication or conduct on the basis of sex; (3) the conduct or communication was unwelcome; (4) the unwelcome conduct or communication was intended to or did in fact substantially interfere with the employee's employment or created an intimidating, hostile or offensive work environment; and (5) respondeat superior. See Radtke v. Everett , 442 Mich. 368, 501 N.W.2d 155, 162 (1993) ; Lowery v. Xerox Corp. , 229 F.3d 1152, 2000 WL 1140522, at *3 n.2 (6th Cir. 2000) (table op.). MWWC asserts that Wheatley has failed to produce evidence to create a genuine dispute of fact as to the fifth element of her claim.
The Court will assume for sake of analysis that Plaintiff has established a question of fact that the harassment she suffered was sufficiently severe and pervasive to be actionable under Title VII. However, she has not met her burden as to respondeat superior, so summary judgment is warranted for this additional reason on her claims under Title VII and the ELCRA.
Respondeat superior exists where an employer knew or should have known the harassment had occurred or that it was reasonably foreseeable but did not take prompt and appropriate remedial action. Williams v. General Motors Corp. , 187 F.3d 553, 561 (6th Cir. 1999) (citing Kauffman v. Allied Signal, Inc. , 970 F.2d 178, 183-84 (6th Cir. 1992) ). An employer is not liable for sexual harassment if the conduct is adequately investigated and prompt and appropriate remedial action is taken after the employer learns of the alleged harassment. Hawkins v. Anheuser-Busch, Inc. , 517 F.3d 321, 340 (6th Cir. 2008) ("An employer's response is unreasonable if it manifests indifference or unreasonableness in light of the facts the employer knew or should have known. A response is generally adequate, however, if it is reasonably calculated to end the harassment." (internal citations and quotations omitted) ).
It is undisputed that MWWC was unaware of Myers' harassment until Wheatley texted Sprank to ask if she had ever had to report an MDOC employee. Once Sprank learned of the harassment, she consistently encouraged Wheatley to report it, and she eventually facilitated Wheatley's complaint to MDOC. While Sprank herself could not investigate the misconduct of an MDOC employee, there is no genuine dispute that she acted swiftly to set the wheels in motion for an investigation *769 into Myers' conduct. Further, MWWC's Executive Director, Griffith encouraged Sprank to continue supporting Wheatley however she could. Sprank undertook remedial measures to ensure that Wheatley would not have to work around Myers without a supervisor present. And there is no evidence in the record that Myers subjected Wheatley to any further harassment after Sprank made those arrangements.[4]
Accordingly, there is no genuine dispute of fact regarding MWWC's liability for the harassment of Myers. Wheatley cannot sustain a hostile work environment claim against MWWC because any reasonable juror would find that MWWC (through Sprank) took immediate, reasonable action after learning of the harassment, and no further harassment occurred. See, e.g., Zeller v. Canadian National Railway Co. , 666 F. App'x 517, 526 (6th Cir. 2016). Thus, any juror would have to conclude that MWWC's response was adequate. For this additional reason, summary judgment is warranted on Wheatley's hostile work environment claim.
C. Wheatley has not created a genuine issue for trial on her retaliation claim under Title VII or the ELCRA because she has produced no evidence of pretext.
Wheatley also alleges that MWWC retaliated against her for filing a complaint against Myers. A prima facie retaliation claim is established by showing: (1) that the plaintiff engaged in an activity protected by Title VII; (2) that the exercise of the plaintiff's civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. See Williams , 187 F.3d at 568 (quoting Wrenn v. Gould , 808 F.2d 493, 500 (6th Cir. 1987) ).
If Wheatley can make out a prima facie case of retaliation, the burden shifts to MWWC to offer a legitimate, non-discriminatory reason for the adverse employment action. Wisniewski v. Pontiac Sch. Dist. , 862 F.Supp.2d 586 (E.D. Mich. 2012) (citing McDonnell Douglas Corp. v. Green , 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ). If MWWC is able to do so, the burden shifts back to Wheatley to demonstrate that the proffered reason is pretextual. Id.
Here, the Court has serious doubts as to whether Plaintiff has made even a prima facie case based on the lack of evidence of a causal connection between the protected activity and the adverse employment action. Plaintiff relies solely on the temporal proximity between raising the harassment with Sprank on May 4, 2016 and her exclusion from MDOC Probation and Parole Offices on May 26, 2016. But Wheatley does not assert that her exclusion from the parole offices was an adverse action; she instead relies on her assertions that MWWC stopped referring new parolees to her and then "terminat[ed] her."[5] Accordingly, the temporal proximity to be considered is between May 4, 2016 and July 11, 2016 when MWWC sent Wheatley a "Statement of Unilateral Modification" which explained that Wheatley would not receive new referrals. Thus, the temporal proximity is not especially strong in this case, especially compared to the sole case *770 Wheatley relies on, Mickey v. Zeidler Tool & Die Co. , in which the employee was terminated on the same day his employer learned he had taken an adverse action. 516 F.3d 516, 527 (6th Cir. 2008). Nevertheless, the Court will assume that Plaintiff has satisfied the first step of the McDonnell-Douglas framework.
MWWC has established a legitimate, non-discriminatory justification for its actions. It is uncontested that, after an audit by the Michigan State Police, MDOC notified MWWC that all of its contractors needed to pass a background check due to their access to sensitive computer programs in MDOC's Probation & Parole offices. MWWC required all contractors to be fingerprinted and background checked to comply with MDOC's policy. Wheatley failed the background check because of her prior conviction. Accordingly, she could not access the MDOC offices, pursuant to an MDOC policy, without a personal escort at all times. It is also undisputed that MDOC policy required that service providers meet high-risk offenders at Probation and Parole offices. Thus, MWWC was placed in a difficult position for reasons outside its control-Wheatley was no longer able to meet with a portion of her client base at the only place were such a meeting would be permissible by MDOC policy. And even for offenders Wheatley could meet outside of the Probation and Parole offices, it was often a preferred meeting place for matters of convenience.
It is also uncontested that Wheatley had difficulty meeting her reporting deadlines over the Summer of 2016. She also allegedly communicated in an unprofessional and passive-aggressive manner to MWWC contractors and MDOC employees.
MWWC articulated all of aforementioned justifications for modifying and then not renewing Wheatley's contract. Thus, the burden shifts to Wheatley to proffer enough evidence to create a genuine issue of fact that MWWC's justification was pretextual. To demonstrate pretext, Wheatley must show that MWWC's explanation (1) had no basis in fact, (2) did not actually motive its conduct, or (3) was insufficient to warrant the challenged conduct. Browning v. Dept. of the Army , 436 F.3d 692, 695 (6th Cir. 2006).
Wheatley does not clearly invoke any of the three methods of establishing pretext. She instead opts for unsupported bluster, abandoning citations to the record and any attempt to proffer particular pieces of evidence which would tend to show that MWWC's justification was pretextual. (See ECF No. 66 at PageID.882-83.)
Importantly, Plaintiff does not squarely respond to MWWC's assertion that it was motivated to take adverse action against her because she could no longer enter MDOC Parole and Probation offices without an escort. Likewise, she does not respond to MWWC's assertion that she consistently missed reporting deadlines. She merely states without explanation that "none of the issues raised by Defendant rise to the [level] of a 'legal, legitimate reason' to terminate [her] ...." (ECF No. 66 at PageID.883.)
Instead, Plaintiff takes issue with MWWC labeling her emails as "passive-aggressive behavior." She suggests she was just sarcastic or was addressing the alleged discrimination and was justifiably upset. To the extent that Plaintiff is apparently arguing that her conduct would not warrant having her contract modified and not renewed, the argument is highly underdeveloped and unpersuasive, not least because she has failed to address MWWC's other legitimate, non-discriminatory justifications.
Wheatley also compares her behavior to Myers' conduct and notes that Myers has not been terminated. Of course, this is a logical fallacy. Myers is not an MWWC
*771 employee and her employment status is utterly irrelevant to the pertinent question: Whether or not MWWC's stated reasons for modifying (and declining to extend) Plaintiff's contract were pretext.
Summary judgment is entirely appropriate on Plaintiff's retaliation claim because she has produced less than a scintilla of evidence that MWWC's decisions were not motivated by the legitimate, non-discriminatory reasons it has consistently articulated to her.
D. Plaintiff's public accommodation claim fails because she has not alleged that MWWC ever denied her a public accommodation.
Plaintiff's final claim is she was "sexually harassed in violation of the public accommodations and public services provision" of the ELCRA. Under this section, the ELCRA prohibits sexual harassment, including unwelcome sexual conduct or advances that have "the purpose or effect of substantially interfering with an individual's ... public accommodations or public services ... or creating an intimidating, hostile, or offensive ... public accommodations [or] public services ... environment." MCL 37.2103(i)(iii).
Plaintiff has not explained how the alleged harassment by Myers was for the "purpose or effect of substantially interfering" with her ability to access a public accommodation or public service. As argued, Wheatley merely states that Myers' harassing conduct "interfered with her ability to do her job." (ECF No. 66 at PageID.887.) Nor has she explained how Myers' harassment is attributable to MWWC. To the extent that Plaintiff is claiming she was denied access to the MDOC Parole and Probation offices, that decision was indisputably made by MDOC and was not made on the basis of sex. Once again, no reasonable juror could find that MWWC violated Plaintiff's right to access public accommodations and public services because of harassment she experienced at the hands of MDOC employee Myers.
IV. Conclusion
In sum, the Court will grant MWWC's summary judgment motion for the numerous reasons explained above.
ORDER
For the reasons contained in the accompanying Opinion, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 58).
IT IS FURTHER ORDERED that Plaintiff's complaint be DISMISSED WITH PREJUDICE.
JUDGMENT TO ENTER SEPARATELY.
IT IS SO ORDERED.

However, Wheatley's public accommodation claim under the ELCRA is not contingent on an employer/employee relationship.

The parties agree that Title VII and the ELCRA are functionally identical for purposes of the claims alleged.

Additionally, Jason Furst's testimony that he perceived Wheatley to be an employee of MWWC has no significance. Furst's only contact with Wheatley was in terms of the investigation into Myers' conduct and his parallel investigation into Chrysten Gregory. He did not work with Wheatley himself, and had no personal knowledge of Wheatley's relationship to MWWC. Thus his deposition testimony is of no consequence.

While Myers allegedly told Wheatley that she was transitioning to a position where she could refer parolees to Wheatley, there is no indication in the record that this communication was anything other than innocuous.

The Court notes that Wheatley was never "terminated." MWWC chose not to renew her one-year contract after it expired on September 30, 2016.